**UNITED STATES OF AMERICA, Appellant**

**v.**

**JEWEL ROSE HYDE; PATRICIA YVONNE GRAY; KAREN BOOTHE, a/k/a Karen Boothe Waller, a/k/a Karen Ann Marie Boothe**

No. 93-7790

United States Court of Appeals

for the Third Circuit

September 28, 1994

HUGH P. MABE, III, United States Attorney, AZEKAH E. JENNINGS, Assistant U.S. Attorney, Christiansted, St. Croix V.I.; KATHLEEN A. FELTON (Argued), (U.S. Department of Justice, Washington, D.C. 20044, *for appellant*

BENNETT CHAN, DEVERITA C. STURDIVANT, (DUDLEY, CLARK & CHAN), Charlotte Amalie, St. Thomas, V.I., *for appellee*

HENRY V. CARR, III, Charlotte Amalie, St. Thomas V.I., *for appellee* Patricia Yvonne Gray

THURSTON T. MCKELVIN, Federal Public Defender, LAURA M. PALGUTA (Argued), Asst. Federal Public Defender, Charlotte Amalie, St. Thomas, V.I. *for appellee* Karen Boothe, a/k/a Karen Boothe Waller, a/k/a Karen Ann Marie Boothe

ROSALIE SIMMONDS BALLENTINE, Attorney General, PAUL L. GIMENEZ, Solicitor General, PAMELA LYNN WOOD (Argued), Assistant Attorney General, (Virgin Islands Department of Justice), Charlotte Amalie, St. Thomas, V.I., *for Amicus Curiae Government of the Virgin Islands*

BEFORE: STAPLETON, ALITO and WEIS, *Circuit Judges*

On Appeal From the United States District Court
For the District of the Virgin Islands

## OPINION OF THE COURT

STAPLETON, *Circuit Judge:*

Jewel Rose Hyde ("Hyde"), Patricia Gray ("Gray"), and Karen Boothe-Waller ("Boothe-Waller") were subjected to pat-down searches by customs officers at the St. Thomas airport as they were leaving the Virgin Islands for Miami, Florida. The district court suppressed the cocaine seized as a result of those searches on the ground that the customs officers had no probable cause to search the women and the search therefore violated their Fourth Amendment right to be free from unreasonable searches and seizures. We hold that routine customs searches of persons and their belongings without probable cause as they leave the Virgin Islands for the continental United States are not unreasonable under the Fourth Amendment. We will therefore reverse the district court's suppression order.

I.

The facts of this case are not in dispute. In March of 1993, persons leaving the Virgin Islands were required to fill out customs declaration forms and go through a preclearance inspection station where they could be questioned by customs officials, and where their persons and their luggage could be searched. Hyde, Gray, and Boothe-Waller went to the St. Thomas airport with the intention of board-

476

ing a flight to Miami, Florida. Hyde, who entered the airport first and appeared to be traveling alone, was questioned about her trip to the Virgin Islands by Senior Customs Inspector Gloria A. Lambert ("Lambert"). Hyde told Lambert that she had stayed in the Virgin Islands for two days, and that the purpose of her trip was to shop. Hyde had not, however, declared any merchandise on her customs form, and Lambert did not find any merchandise in Hyde's luggage.

At this point, Lambert overheard another inspector questioning Boothe-Waller, who also claimed that she had stayed in the Virgin Islands for two days. Lambert told Hyde to wait while she went over to question Boothe-Waller and Gray, who was standing next to Boothe-Waller. In response to a question from Lambert, Boothe-Waller stated that the reason for her short stay on the island was that her employer had called her back to the United States. Gray apparently said little, but, in Lambert's opinion, appeared to be nervous. Lambert searched the luggage of both Boothe-Waller and Gray but found nothing unusual. Lambert, who had become suspicious, then directed all three women to a secondary search area where she performed a pat-down search of each of them. During the pat-downs, Lambert discovered a bulge under the clothing of each of the women. Upon further inspection, Lambert discovered that each had a package of cocaine taped to her body.

Hyde, Boothe-Waller, and Gray were arrested and subsequently charged with conspiracy to import cocaine into the United States in violation of 21 U.S.C. §§ 963 and 952 and with possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). They each made a motion to suppress the evidence seized by Lambert on the grounds that Lambert did not have probable cause, or even reasonable suspicion, to conduct the searches.

Following an evidentiary hearing, the district court granted the defendants' suppression motions. Because Lambert lacked even reasonable suspicion to detain and search the defendants, the district court concluded that the cocaine had to be suppressed as fruit of a Fourth Amendment violation unless, as the government urged, the "border search" doctrine of Fourth Amendment jurisprudence applied under these facts. The district court found the border search doctrine inapplicable because Hyde, Gray, and Boothe-Waller were traveling from St. Thomas to Florida and there is no national border between the Virgin Islands and the continental United States.

The government does not contend that the district court erred when it found that Lambert lacked reasonable suspicion of criminal activity when she conducted the searches. Therefore, the issue before us is whether an individual leaving the Virgin Islands for one of the fifty states may be subjected to a routine customs[1] search prior to departure in the absence of any degree of suspicion that the individual is engaged in wrongdoing. We exercise plenary review over this legal question. Curcio v. John Hancock Mutual Life Insur. Co., _____ F.3d _____ (3d Cir. 1994).

## II.

The Fourth Amendment prohibits only unreasonable searches and seizures. Harris v. United States, 331 U.S. 145, 150 (1947). What is reasonable "depends upon all of the circumstances surrounding the search and seizure and the nature of the search and seizure itself." United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985). The general rule is that "warrantless searches are presumptively unreasonable." Horton v. California, 496 U.S. 128, 133 (1990). The courts, however, have fashioned exceptions to the general rule which recognize that in certain limited situations the government's interest in conducting a search without a warrant outweighs the individual's privacy interest. Montoya de Hernandez, 473 U.S. at 537 ("The permissibility of a particular law enforcement practice is judged by 'balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'") Border searches are one such exception.

The principle that searches at a border, without probable cause and without a warrant, are nonetheless "reasonable" is "as old as the Fourth Amendment itself." United States v. Ramsey, 431 U.S. 606, 619 (1977). As early as Boyd v. United States, 116 U.S. 616 (1886), the Supreme Court noted that the border search doctrine was not subject to the general warrant requirement of the Fourth

---

[1] The pat-down search in this case is not alleged to have been conducted in an unreasonably intrusive manner. We have no occasion here to speak to reasonableness of more intrusive searches and detentions for search purposes without probable cause or reasonable suspicion. See, e.g., United States v. Montoya de Hernandez, 473 U.S. 531 (1985) (27 hour detention at border and rectal search of a woman suspected of smuggling drugs in her alimentary canal).

Amendment. The Court explained that the first Congress, which proposed the Bill of Rights, also authorized warrantless border searches to collect customs duties and therefore did not intend such searches to come within the prohibitions of the Fourth Amendment:

> The seizure of stolen goods is authorized by the common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to avoid the duties payable on them, has been authorized by English statutes for at least two centuries past; and the like seizures have been authorized by our own revenue acts from the commencement of the government. The first statute passed by Congress to regulate the collection of duties, the act of July 31, 1789, 1 stat. 29, 43, contains provisions to this effect. As this act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as "unreasonable," and they are not embraced within the prohibition of the amendment.

Id. at 623 (footnote omitted).

The justification for the border search exception was explained by the Supreme Court in a series of cases in the 1970s. In United States v. 12 200-Ft. Reels of Film, 413 U.S. 123, 125 (1973), the Court observed that "searches of persons and packages at the national borders rest on different considerations . . . from domestic regulations. The Constitution gives Congress broad, comprehensive powers '[t]o regulate commerce with foreign Nations.' Art. I, § 8, cl. 3. Historically, such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from entry."

Soon thereafter, in United States v. Ramsey, 431 U.S. 606, 620 (1977), the Court elaborated further, stating that "[t]he border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." The inapplicability of the Fourth Amendment to border searches was, to the Court, evident: "That searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration." Id. at 616. The Court also noted that there are "limited justifiable expectations

of privacy" when persons or goods are presented for entry into the United States. Id. at 623 n.17. "[A] port of entry is not a traveler's home." Id. at 618 (quoting United States v. Thirty-Seven Photographs, 402 U.S. 363, 376 (1971)).

The Supreme Court's most recent comment on the justification for the border search exception came in United States v. Montoya de Hernandez:

> Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country.

473 U.S. 531, 537 (1985).

> Balanced against the sovereign's interests at the border are the Fourth Amendment rights of respondent. Having presented herself at the border for admission, and having subjected herself to the criminal enforcement powers of the Federal Government, 19 U.S.C. § 482, respondent was entitled to be free from unreasonable search and seizure. But not only is the expectation of privacy less at the border than in the interior, see, e.g., Carroll v. United States, 267 U.S. 132, 154 (1925); cf. Florida v. Royer, 460 U.S. 491, 515 (1983) (BLACKMUN, J., dissenting), the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border.

Id. at 539–40.

As appellees stress, all of the Supreme Court's border search cases involve searches at an international boundary or its functional equivalent.[2] This is not surprising: not only does a sovereign

---

[2] The Supreme Court has held that valid warrantless border searches may take place at the "functional equivalent" of an international border or an "extension" thereof. As this court explained in United States v. Caminos. 770 F.2d 361, 364 (3d Cir. 1985):

> Border searches are legitimate not only at the physical boundaries of the nation, but also at the 'functional equivalent' of the border. Almeida-Sanchez v. United States, 413 U.S. 266, 272–73 (1973). In Almeida-Sanchez the Supreme Court suggested that the St. Louis Airport would be the "functional equivalent" of the border were it the first point of landing of a nonstop fight from abroad. Id.

A related exception to the Fourth Amendment warrant requirement con-

normally impose customs duties and attempt to exclude undesired people and goods at its international borders, but the authority of the United States to impose such duties and to exclude people and goods at places other than its international borders is also substantially restricted by the Constitution. Here we are presented with a situation somewhat different from the usual one, a situation in which the sovereign has created a border within its sovereign territory. As we see, however, not all territory over which a sovereign exercises sovereignty has the same legal status, and borders between "incorporated" and "unincorporated" territory of a sovereign have many of the characteristics of international borders.

In Downes v. Bidwell, 182 U.S. 244 (1901), the Supreme Court was confronted with the contention that territory acquired by the United States through discovery, military conquest, or treaty was automatically incorporated into the United States upon its acquisition. This contention was made in support of a claim that merchandise shipped from Puerto Rico to New York was exempt from a customs duty imposed by Congress on goods so shipped. This duty was alleged to be unconstitutional in light of Article I, section 8, of the Constitution, which declares that "all duties, imports, and excises shall be uniform throughout the United States," and Article I, section 9, which stipulates that "vessels bound to or from one State" cannot "be obliged to enter, clear or pay duties in another." While no opinion in Downes commanded the allegiance of a majority of the Court, five of the justices agreed with Justice White's summary of the relevant principles:

> It may not be doubted that by the general principles of the law of nations every government which is sovereign within its sphere of action possesses as an inherent attribute the power to

---

cerns "extended border searches." An extended border search takes place after the first point in time when the person or package might practicably have been stopped and searched. United States v. Niver, 689 F.2d 520, 526 (5th Cir. 1982). It requires the same showing as a border search, but because it entails a greater intrusion on legitimate expectations of privacy, it also requires a showing of "reasonable suspicion." 689 F.2d at 526.

See 2 John Wesley Hall, Jr., Search and Seizure, §§ 26:19–32 (2d ed. 1993). There is no contention that these principles are applicable in this case.

acquire territory by discovery, by agreement or by treaty, and by conquest. It cannot also be gainsaid that as a general rule whenever a government acquires territory as a result of any of the modes above stated, the relation of the territory to the new government is to be determined by the acquiring power in the absence of stipulations upon the subject.

Id. at 300 (White, J., concurring). Accordingly, the Court concluded that Puerto Rico did not automatically become an integral part of the United States when Spain ceded it to the United States. Because Congress had not acted to incorporate Puerto Rico into the United States and it was "merely appurtenant thereto as a possession," Congress could impose the challenged duty, free of the constitutional requirement that impost must be uniform throughout the United States. Id. at 341 (White, J., concurring).

Based on Downes, the Supreme Court in David Kaufman & Sons Company v. Smith, 216 U.S. 610, 611 (1910), later upheld the authority of Congress to adopt a statute providing "that all laws affecting imports of articles, goods, wares, and merchandise and entry of persons into the United States from foreign countries shall apply to articles, goods, wares, and merchandise and persons coming from the Canal Zone, Isthmus of Panama, and seeking entry into any State or Territory of the United States or the District of Columbia."

The Virgin Islands are an unincorporated territory of the United States. Smith v. Government of the Virgin Islands, 375 F.2d 714 (3d Cir. 1967). As an unincorporated territory, they are subject to the power of Congress under Article IV, Section 3 of the Constitution[3] to make rules and regulations to govern the territory. Since the current legal relationship between the Virgin Islands and the United States is not materially different from that of Puerto Rico and the Panama Canal Zone at the time Downes and David Kaufman were decided, it is clear that Congress has the authority to create a border for customs purposes between the Virgin Islands and the rest of the country.

Shortly after the United States acquired the Virgin Islands from Denmark in 1917, Congress exercised that authority to create a bor-

---

[3] Article IV, Section 3, cl. 2 provides in part:
   The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory . . . belonging to the United States.

der between the Virgin Islands and the rest of the United States for customs purposes. The statute passed by Congress provided that "[t]here shall be levied, collected, and paid upon all articles coming into the United States or its possessions from the Virgin Islands the rates of duty and internal-revenue taxes which are required to be levied, collected, and paid upon like articles imported from foreign countries." See Act of March 3, 1917, § 3 (reprinted in 1 V.I. Code Ann. 42 (1967)). Pursuant to the same statute, the duties so collected were not "converted into the general fund of the Treasury of the United States, but [were to be] used and expended for the government and benefit of said islands." Id., § 5. Consistent with the approach of imposing duty on goods leaving the Virgin Islands for the mainland, an approach which remains in place today, the Tariff Act of 1930 specifies that the United States customs territory excludes the Virgin Islands. For purposes of that general tariff statute, "[t]he term 'United States' includes all Territories and possessions of the United States except the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, and the island of Guam." 19 U.S.C. § 1401(h).

Moreover, Congress has specifically authorized customs inspections when travelers enter the United States from the Virgin Islands and other United States possessions in the same manner as if the traveler had come from a foreign country:

> Whenever a vessel from a foreign port or place or from a port or place in any Territory or possession of the United States arrives at a port or place in the United States . . ., the appropriate customs officer for such port or place of arrival may . . . cause inspection, examination, and search to be made of the persons, baggage, and merchandise discharged or unladen from such vessel.[4]

19 U.S.C. § 1467.

Thus, since the acquisition of the Virgin Islands, Congress has consistently asserted its authority to impose a border between the

---

[4] The preclearance inspection that was conducted in this case, at the point of departure from the Virgin Islands instead of at arrival within the United States, is authorized by 19 C.F.R. § 122.144(b). A preclearance inspection on flights bound directly for the United States is the same as a border search conducted immediately upon arrival in the United States and has the same permissible scope as any other border inspection. See United States v. Walczak, 783 F.2d 852, 855–56 (9th Cir. 1986).

483

Virgin Islands and the rest of the United States for customs purposes and has authorized customs officials to search vessels and goods passing between the Virgin Islands and the rest of the country. Customs searches of persons traveling from the Virgin Islands to the mainland have thus been conducted consistently for over 75 years.

We agree with the district court that the situation before us differs from the situations before the Supreme Court in its border search case and, accordingly, that those cases do not directly support application of the border search exception to the search at issue. On the other hand, we cannot agree with the district court that the rationale of those cases preclude application of the exception only to searches at an international border. Indeed, we believe the rationale of those cases supports a contrary conclusion.

Congress has broad power to regulate commerce between the United States and its unincorporated territories, just as it has broad authority to regulate commerce with foreign nations. It has constitutionally exercised the former power to create a border for customs purposes between the Virgin Islands and the United States. Routine warrantless border searches without probable cause would appear to be as essential to the accomplishment of the objects of that customs border as similar traditional searches have universally been recognized to be to the objectives of traditional customs systems at international borders. Thus, as far as the interests of the sovereign are concerned, we perceive the interest of the United States in warrantless searches without probable cause at this "internal" border to be little different from its interest in such searches at its international borders.

Similarly, with respect to the other side of the balance, we do not find the reasonable expectations of individual privacy in the circumstances under which Hyde, Gray, and Boothe-Walker were searched to be materially greater than the reasonable privacy expectations of travelers at an international border. As we have indicated, border searches have been consistently conducted at the border between the Virgin Islands and the mainland since the United States acquired the Virgin Islands. While first time visitors to the Virgin Islands may not have specific awareness of this fact, we believe that there is sufficient public knowledge of the distinctive status of the Virgin Islands to alert such travelers to the possibility of border inquiries not experienced at state lines.

484

■ Balancing the "intrusion on the individual's Fourth Amendment interests against" the degree to which routine customs searches "promot[e] legitimate governmental interests," we conclude that the searches in this case were not unreasonable for purposes of the Fourth Amendment.

Unlike the district court, we do not find Torres v. Puerto Rico, 442 U.S. 465 (1979), relevant to the issue before us. The Supreme Court there struck down as violative of the Fourth Amendment an act of the legislature of the Commonwealth of Puerto Rico authorizing police officers to conduct warrantless searches of the baggage of any person arriving in Puerto Rico from the United States. The Commonwealth sought to analogize searches conducted pursuant to the challenged statute to searches conducted by federal customs agents at an international border of the United States. The analogy was rejected. The Court explained that "[t]he authority of the United States to search the baggage of arriving international travelers is based on its inherent sovereign authority to protect its territorial integrity" and that, unlike the federal government, "Puerto Rico has no sovereign authority to prohibit entry into its territory; as with all international ports of entry, border and customs control for Puerto Rico is conducted by federal officers." Id. at 472–73.

Thus, Torres does not hold, as the district court suggested, that the border search exception does not apply to travel between two areas controlled by the same sovereign. The problem in Torres was that the local government of Puerto Rico had no authority to enact a statute creating a border between Puerto Rico and the rest of the United States, and there was accordingly no justification for recognizing an exception to the general requirement of a warrant.

Appellees stress that after Congress enacted 19 U.S.C. § 1467 authorizing customs searches at the borders between the United States and its possessions, it provided in the Organic Act of 1936 that in the Virgin Islands "the right to be secure against unreasonable searches and seizures shall not be violated," and "[n]o warrant for arrest or search shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." They also point out that in 1968 Congress amended § 3 of the Revised Organic Act of 1954 to provide in part as follows:

> The following provisions of and amendments to the Constitution of the United States are hereby extended to the Virgin Is-

lands to the extent that they have the same force and effect there as in the United States or in any State of the United States . . . the first to ninth amendments inclusive. . . .

All laws enacted by Congress with respect to the Virgin Islands and all laws enacted by the territorial legislature of the Virgin Islands which are inconsistent with the provisions of this subsection are repealed to the extent of such inconsistency.

48 U.S.C. § 1561. Appellees urge that these actions by Congress repeal 19 U.S.C. § 1467.

We perceive no intent on the part of Congress to repeal § 1467. As we have pointed out, when Congress mandated that the Fourth Amendment would be applicable in the Virgin Islands to the same extent as in the United States, a customs border had been in place between the Virgin Islands and the mainland for many years and the duties collected at that border were a source of revenue for the Virgin Islands government. Customs officials had been conducting warrantless searches of vessels and packages pursuant to express congressional authorization for many years, and those searches were essential to the effective surveillance of the customs border and to the efficient collection of the duties Congress had imposed. If Congress, by extending the Fourth Amendment to the Virgin Islands, had intended to strip custom officials of the ability to perform their surveillance effectively, we believe the legislative history would bear some evidence of that intent, and we have found none. We think it far more likely that Congress in 1936 and 1968, like the first Congress, saw searches to collect customs duties as matters of time honored necessity, and perceived no inconsistency between its authorization of such searches and the Fourth Amendment's prohibition against "unreasonable searches."

III.

We will reverse the district court's suppression order and remand for further proceedings consistent with this opinion.