**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**KEVIN DAVID (d/o/b 09/18/71), Defendant**

Criminal No. F53/2002

Territorial Court for the Virgin Islands

Division of St. Thomas and St. John

October 30, 2002

102

DAMIAN JACKSON, ESQ., Assistant Attorney General, V.I. Department of Justice, St. Thomas, U.S. Virgin Islands, *Attorney for the Plaintiff*

STEPHEN A. BRUSCH, ESQ., The Brusch Law Firm, St. Thomas, U.S. Virgin Islands, *Attorney for the Defendant*

HOLLAR, *Judge*

## MEMORANDUM OPINION

(October 30, 2002)

This matter came before the Court on the defendant's Motion to Suppress. The Government filed an Opposition. The Court scheduled a hearing on that motion on July 12, 2002. At the hearing, the Court heard arguments and proffered testimony from counsel for the respective parties. The Court reserved ruling on the motion and, in an Order dated July 15, 2002, the parties were directed to file supplementary Memoranda of Points and Authorities. For reasons that follow, the Court will deny the motion to suppress.

## I. FACTS AND PROCEDURAL HISTORY

The Government of the Virgin Islands alleges in a single count Information that defendant Kevin David (hereinafter "David") knowingly and intentionally possessed a controlled substance with the intent to distribute, to wit: marijuana, in violation of V.I. CODE ANN. tit. 19, § 604(a)(1). Accompanying the information was an affidavit sworn to by Lieutenant Rodney Querrard of the Virgin Islands Police Department. Prior to the filing of the information and affidavit, a Probable Cause Fact Sheet, filed by the Lieutenant was utilized and referred to at the defendant's advice of rights hearing. According to Lieut. Querrard, on February 5, 2002, the Drug Enforcement Agency (DEA) agents in the Atlanta, Ga. airport observed the defendant in possession of a "large" sum of cash while passing airport security on his way to a flight to St. Thomas, Virgin Islands. At that point, David had two (2) checked pieces of luggage but no carry-on luggage. Agents then observed that while the defendant was walking through the jetway[1] to board the aircraft before departure, a person, appearing to be an airport employee, but unidentified, met David. While David was in flight, the Atlanta agents contacted and alerted law enforcement in St. Thomas. Those Atlanta agents gave a description of David and his possessions. At about 2:30 p.m., on February 5, 2002, law enforcement in St. Thomas observed a person matching David's description disembark the Delta flight from Atlanta, Ga., which arrived at Cyril E. King Airport. The individual matching the description of David *had in his possession a black piece of carry-on luggage*. At the baggage claim area, David picked up the two (2) pieces of luggage he checked in Atlanta, Ga. Officers then approached the man meeting David's description. After confirming it was in fact David, he was asked to accompany the officers to an area near the U.S. Customs office and he agreed. They then asked him to consent to a search of his person and belongings. He refused a search of his belongings but consented to a search of his person. That search disclosed approximately Four Thousand Five Hundred Twenty-Six Dollars and 00/100 ($4,526.00) in small denominations found in his pocket and concealed in the collar area of his jacket. The officers also

---

[1] A "jetway" is "a telescoping corridor that extends from an airport terminal to an aircraft, for the boarding and disembarking of passengers." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. Houghton Mifflin 2000).

brought a trained drug sniffing police dog to sniff David and his possessions. The dog *did not* react to David's luggage but did react to the currency.[2] At about 3:40 p.m., United States Customs Inspector Gloria Lambert searched David's luggage without his consent. This search revealed ten (10) cellophane-wrapped bundles appearing to contain marijuana found among clothing contained in his luggage. The bundles field tested positive for marijuana. David acknowledged ownership of the clothes but denied any knowledge of the drugs. David was then arrested and advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

## II. ANALYSIS

The defendant advances the following issues for the Court's resolution: (1) whether contraband seized during an unconsented search of *an arriving passenger* from the United States mainland to the U.S. Virgin Islands must be suppressed if the search was made by a Customs Inspector without a warrant or probable cause; and (2) whether contraband seized by law enforcement must be suppressed if the Equal Protection provisions of the Fourteenth Amendment as applied to the Territory were violated.

## A. CONTRABAND SEIZED BY CUSTOMS INSPECTORS DURING AN UNCONSENTED SEARCH OF AN ARRIVING PASSENGER FROM THE UNITED STATES MAINLAND TO THE U.S. VIRGIN ISLANDS NEED NOT BE SUPPRESSED, EVEN IF DONE WITHOUT A WARRANT OR PROBABLE CAUSE.

■■ In this case, the Court must decide whether the search of the defendant's luggage was in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures. In the absence of an exception, the Exclusionary Rule requires this Court to suppress evidence gathered by means of a constitutionally unreasonable search. *See United States v. Hodge*, 42 V.I. 437, 450, 89 F. Supp. 2d 668 (D.C.V.I. 2000). There is no question that the Fourth Amendment is

---

[2] The Court takes judicial notice that there is a substantial amount of circulated U.S. currency that has enough trace amounts of drugs to alert trained drug sniffing dogs. *See, e.g., United States v. $30,060.00 in U.S. Currency*, 39 F.3d 1039, 1041-42 (9th Cir. 1994).

applicable throughout the United States, including at its borders. *See U.S. v. Ramsey*, 431 U.S. 606, 97 S. Ct. 1972, 52 L. Ed. 2d 617 (1972). There is also no question that it applies throughout the Virgin Islands.[3] *See* Revised Organic Act of 1954 § 3 (as amended) (applying the Fourth Amendment to the Virgin Islands); 48 U.S.C. § 1561. The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

■ The defendant claims that the search of his luggage violated the Fourth Amendment and thus must be suppressed. In order to rule on the legality of the search, the Court has to decide what level of protection was afforded David under the Fourth Amendment when the Customs Inspector made a search of his luggage without consent. The Fourth Amendment prohibits only *unreasonable* searches and seizures. The reasonableness of a search is contingent on the particular circumstances of the search. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S. Ct. 3304, 3308, 87 L. Ed. 2d 381 (1985).

## 1. A Routine Search of an Individual at a Traditional Border is Authorized and Reasonable Albeit Without a Warrant, Probable Cause, or Reasonable Suspicion.

■ The general rule is that warrantless searches are *presumptively unreasonable*. *Horton v. California*, 496 U.S. 128, 133, 110 S. Ct. 2301, 2306, 110 L. Ed. 2d 112 (1990). In order for a police officer to obtain a warrant, a neutral magistrate must find objective facts demonstrating probable cause *before* the search is conducted. *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). In the present case, there was no warrant issued prior to the search. Once law enforcement asked the defendant for consent and the consent was refused, the resulting search without a warrant *or some other exception* was unreasonable.

---

[3] Whenever the term Virgin Islands is used in this Opinion it means the Territory of the *United States* Virgin Islands.

■ Several exceptions to the general rule requiring a warrant exists whereby search and/or seizure is considered reasonable even in the absence of a warrant. First, there are instances where officers who, having *probable cause* to believe a crime is or has been committed, may make a search or seizure without a warrant. The instances include, but are not limited to, the arrest, upon probable cause, of persons in a public place and searches and seizures made under exigent circumstances. *See, e.g., United States v. Watson*, 423 U.S. 411, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976) (allowing arrest of person in public upon probable cause but without a warrant). Hence, search and/or seizure is permissible under certain circumstances without first going to a magistrate. *United States v. Ross*, 456 U.S. 798, 808, 102 S. Ct. 2157, 2165, 72 L. Ed. 2d 572 (1982) ("... a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained.") Second, there are occasions of personal searches and seizures, made in the course of investigating crimes, where the intrusion on a person's liberty interest is slight in comparison to the Government's interest in preventing crime. Such limited searches and seizures are known as "Terry Stops" and require only 'reasonable suspicion' that a crime is afoot or has been committed even without a warrant being obtained or probable cause being established. *See Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Finally, at our borders, where the Government's interests are at its zenith and a person's liberty interests are at its nadir, no warrant is required before conducting a search. At borders, customs officials can make "routine" searches and seizures without any *objective suspicion* or *probable cause*, and if reasonable articulable suspicion exists to believe an offense has been committed or is afoot, as existed in this case, customs officials can make both "routine" and "non routine"[4] searches and seizures. *See, e.g., Attallah v. United States*, 955 F.2d 776, 784 (1st Cir. 1992) (probable cause not required for border search by customs agent because of less stringent 4th amendment standards); *U.S. v. Charleus*, 871 F.2d, 265, 267 (2d Cir. 1989) (neither probable cause nor reasonable suspicious is required for customs officials to conduct routine border search of personal belongings and effects); *United States v. Ezeiruaku*, 936 F.2d 136, 140 (3d Cir. 1991) (no individual suspicion required for search of

---

[4] For a discussion of the meaning of "routine" and "non routine" *see infra*, II A3.

luggage at border); *see Ramsey*, 431 U.S. at 626, 97 S. Ct. at 1979 ("This interpretation, that border searches were not subject to the warrant provisions of the Fourth Amendment and were "reasonable" within the meaning of that Amendment, has been faithfully adhered to by [this] Court."). Moreover, even when not located at the physical border of United States, international airports are treated as the "functional equivalent" of a border. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 272-73, 93 S. Ct. 2535, 2539-40, 37 L. Ed. 2d 596 (1973) (stating that an international airport in the middle of the mainland should be considered a border for the purposes of the border search exception).

## 2. An "Internal" Border Exists In The U.S. Virgin Islands

▌ A key inquiry in this case is whether U.S. Customs Inspectors have the authority to conduct searches without probable cause on persons coming from the U.S. mainland arriving in Cyril E. King Airport in St. Thomas, Virgin Islands. Resolution of that inquiry requires a discussion of what is known as the "customs border" *established in the U.S. Virgin Islands*.[5] Even though the territory of the Virgin Islands is a possession of the United States, *it is not within* what is referred to sometimes as the *U.S. Customs Zone* because the U.S. Virgin Islands *are not considered part of United States for U.S. Customs purposes. See* 19 U.S.C. § 1401(h) ("The term 'United States'[6] includes all Territories and possessions of the United States *except the Virgin Islands* ... and the *island of Guam*").[7] The "customs border" in the Virgin Islands was established under the 1917 Organic Act, which "specifically extended the Danish customs law in place in the island at the time of transfer" through both the 1936 and 1954 revisions of the Organic Act; *Paradise Motors, Inc. v. Murphy*, 892 F. Supp. 703, 705-706 (1994); 48 U.S.C. § 1574(c) (extending Danish law that was not inconsistent with the Organic Act). Accordingly, there is an "internal customs border" between the U.S. Virgin Islands and the mainland of the United States, Puerto Rico and other U.S. custom zone areas.

---

[5] Ordinarily, a border does not exist *within* a sovereignty.

[6] For purposes of 19 U.S.C. § 1401(h).

[7] Puerto Rico *is not listed as an excluded territory* and thus is part of the "United States" for Customs purposes. The Court notes the circularity of using the term "United States" to define the term "United States."

### a. Departure Procedures From The Virgin Islands Into the United States

Customs duties are levied on goods and articles coming from the Virgin Islands arriving in the customs territory of the United States pursuant to 48 U.S.C. § 1394. (placing the same duty on goods *coming from* the Virgin Islands as goods *coming from foreign countries*, with certain exceptions). For convenience of those departing, customs has established a "pre-clearance" check-point in the Virgin Islands so that customs inspection takes place *before* passengers depart from the Territory to the mainland. Customs agents inspecting goods and articles *coming from* the Virgin Islands are *acting on behalf of the Federal U.S. Government*.

### b. Arrival Procedures From the United States Into the Virgin Islands

Goods and articles *coming from* the customs territory (or Custom Zone) of the United States, *i.e.,* mainland United States, Puerto Rico, etc. into the U.S. Virgin Islands are also subject to customs duties but pursuant to *48 U.S.C. § 1642* (mandating the customs duties collected by U.S. Customs be returned to the treasury of the Virgin Islands minus administrative costs) and not *48 U.S.C. § 1394* where the revenues inure to the treasury of the "Federal Government". In 1977, Congress amended the Revised Organic Act of 1954 to authorize the Virgin Islands Legislature to vary the customs duties for goods imported into the Virgin Islands. 48 U.S.C. § 1574(f), *added by* Pub. L. No. 95-134 (1977).

### c. A Search is Authorized at An "Internal" Border For Passengers Departing From the Virgin Islands and Entering the United States Customs Zone

█ It is well settled law in the Third Circuit that Congress could establish a customs border between the Virgin Islands (an unincorporated territory) and the Customs territory of the United States. Congress has in fact exercised that authority so that persons and things departing from the Virgin Islands going to the customs territory of the United States are subject to routine border searches by Customs Officers. *See United States v. Hyde*, 37 F.3d 116, 30 V.I. 475 (3d Cir. 1994). Despite the fact that the United States mainland and the Virgin Islands share the same

109

sovereign, the United States can nevertheless establish a border between an "incorporated" and an "unincorporated" territory,[8] which would have the characteristics of an international border. *See id.*, at 120. Therefore, the Third Circuit held that the Virgin Islands was a customs border and Customs officers could search a person *departing the Virgin Islands for the mainland*:

> Thus, as far as the interests of the sovereign are concerned, we perceive the interest of the United States in warrantless searches without probable cause at this 'internal' border to be little different from its interest in such searches at its international borders.

*Id.* at 122.

### d. A Customs' Routine Search at an Internal Border is Equally Authorized For Passengers Coming From A United States Customs Zone and Entering the Virgin Islands

The defendant argues that no such suspicionless searches should be allowed when people are coming into the Territory of the U.S. Virgin Islands from a "United States customs territory". Essentially, defendant contends that the V.I. "internal" border should be considered "one-way" *from the U.S. Virgin Islands to the U.S. mainland, or Puerto Rico and/or other U.S. Custom Zone areas only* and no border search exception

---

[8] An "unincorporated" territory of the United States is a territory acquired by the United States without the expectation that the territory would eventually become a state. The United States Constitution fully applies to "incorporated" territories (those territories that are contemplated to become a state). However, through the so-called *Insular Cases*, the Supreme Court has held that the Constitution does not fully apply to "unincorporated" territories. *See Granville-Smith v. Granville-Smith*, 349 U.S. 1, 5, 75 S. Ct. 553, 555-56, 99 L. Ed. 773, 3 V.I. 701 (1955). The Territory of the United States Virgin Islands is one of only seventeen territories remaining in the world today that are classified under international law as "non-self-governing territories." *See* Information from Non -Self-Governing Territories transmitted under Article 73e of the Charter of the United Nations, U.N. GAOR, 56th Sess., U.N. Doc. No. A/56/67 (May 8, 2001) ["Information from Non-Self Governing Territories"]. N17. The non-self-governing territory of the Virgin Islands is thus the subject of a continuing United Nations campaign to eradicate colonialism as a matter of international human rights. *See* G.A. Res. 146, U.N. GAOR, 55th Sess,, Supp. No. 23, U.N. Doc. A/Res/55/146 (2001) (announcing the Second International Decade Dedicated to the Eradication of Colonialism). Cited in *Ballentine v. United States*, 2001 U.S. Dist. LEXIS 16856 (October 5, 2001).

110

should be authorized of individuals *entering the Virgin Islands from the U.S. mainland, Puerto Rico and other U.S. Custom Zone areas,* absent a warrant or finding of probable cause. This Court cannot agree.

Virgin Islands case law supports the proposition that the internal border is a two-way border. In *United States v. Chabot,* 531 F. Supp. 1063, 19 V.I. 28 (D.C.V.I. 1982), the District Court stated that persons arriving from Puerto Rico (within the U.S. Customs territory or Customs Zone) to St. Croix, U.S. Virgin Islands (outside of the U.S. Customs territory or Customs Zone) were subject to a routine border search even in the absence of any articulable "suspicion" of illegal activity. Although this finding was not necessary to the holding because the Court found that the law enforcement agents had probable cause to search, it is an indication that such internal border searches are appropriate when individuals *enter* the Virgin Islands *from* a U.S. Custom Zone. In *United States v. Herbert,* 886 F. Supp. 524, 32 V.I. 308 (D.C.V.I. 1995), the District Court concluded that the 1917 Organic Act allowed a duty to be imposed on goods from the Virgin Islands to the mainland and other Custom Zone areas (in section 3 of that Act) and a duty on goods going the other way (in section 4 of that Act),[9] thus the internal border is two-way. Although customs inspections on flights arriving from the U.S. mainland or other U.S. Custom Zones are seldom conducted, the District Court found no authority to suggest that the power and authority to conduct a routine border search was lost from such disuse. *Id.*

This Court also finds persuasive the Ninth Circuit's holdings in *U.S. v. Vance,* 62 F.3d 1152 (9th Cir. 1995) because of the striking similarity of circumstances prevalent in that case and the case *sub judice.* That case dealt with the border search of a man *entering the unincorporated Territory of Guam*[10] on a flight from the State of Hawaii. *Guam, like the Virgin Islands, is not included in the customs territory of the United States. See* 19 U.S.C. 1401(h). The Ninth Circuit held that such a search by customs officials[11] required no probable cause and was reasonable

---

[9] This just preserved Danish customs law. As discussed, this customs duty, with some modification, survives to this day.

[10] Guam remains an unincorporated territory of the United States. *Guam v. Guerrero,* 290 F.3d 1210, 1214 (9th Cir. 2002).

[11] Unlike the Virgin Islands, the Government of Guam administers the customs function for that territory. *See Barusch v. Calvo,* 685 F.2d 1199, 1201 (9th Cir. 1982) ("The

111

within the meaning of the Fourth Amendment. *See also, People of the Territory of Guam v. Sugiyama,* 846 F.2d 570 (9th Cir. 1988) (allowing border search of person arriving in Guam from Palau, which was at the time a United States Trust Territory of the Pacific Islands). If customs officials in the unincorporated territory of Guam have the power to conduct warrantless internal border searches of persons and things *coming into that territory* from the U.S. mainland and/or the state of Hawaii, then there is no reason why customs officials in the Virgin Islands should not have similar power.

The defendant also heavily relies on *Torres v. Commonwealth of Puerto Rico,* 442 U.S. 465, 99 S. Ct. 2425, 61 L. Ed. 2d 1 (1979), for the proposition that the local legislature of Puerto Rico could not enact a law that permits warrantless searches of persons entering Puerto Rico from the United States. This argument however is misplaced because the Virgin Islands, unlike Puerto Rico, was given specific authority *by Congress* to levy customs duties on goods coming in from the United States mainland. 48 U.S.C. § 1574(f).[12] In *Torres,* the Supreme Court struck down a law enacted by the *local Puerto Rican legislature* that asserted, by its own authority, the right to conduct suspicionless searches on travelers coming from the U.S. mainland. In so doing, the Supreme Court held that the Government of Puerto Rico did not have the authority to create a customs border between Puerto Rico and the United States. Nothing, however, in *Torres* suggests that *Congress* is devoid of power to establish a customs border between a territory and the U.S. mainland. In fact, the Third Circuit's decision in *Hyde* establishes that Congress *can and did* establish a customs border between the U.S. Virgin Islands and the U.S. mainland and other U.S. custom zone areas. Thus, *Torres* does not prevent this Court from holding that there exists an internal customs border when a person enters the U.S. Virgin Islands from the United States.

Furthermore, the Court takes judicial notice of the fact that cargo of all sorts, and in particular automobiles, are regularly searched by Customs

---

Secretary of the Treasury has delegated to the Government of Guam the authority to administer United States customs in Guam.").

[12] This section states in pertinent part, "The Legislature of the Virgin Islands may impose on the importation of any article into the Virgin Islands for consumption therein a customs duty."

112

(on behalf of the local government) when being imported from the mainland. The Customs Service inspects cargo and levies appropriate duties, which are paid to V.I. Treasury after deductions for administrative costs. These searches are done completely without suspicion and, of course, without a warrant. These searches are necessary to enforce the duties authorized by 48 U.S.C. § 1574(f), as well as to inspect for contraband. *A fortiori*, there is no reason why Customs Inspectors should be limited to only warrantless "internal" border cargo inspections. Travelers from the mainland and other areas within the U.S. Custom Zone can obviously carry with them items that are subject to an imposition of a duty and/or carry items subject to confiscation and seizure if found to be contraband.

The policy that underlies suspicionless searches for people departing the Virgin Islands applies with equal force for people entering the U.S. Virgin Islands. For customs purposes, the Virgin Islands and the United States mainland are treated as if they were different foreign countries. *See Couvertier v. Gil Bonar*, 173 F.3d 450, 452 (1st Cir. 1999). The United States conducts border searches to prevent the entry of contraband and to administer customs duty. *See generally Ramsey, supra*; Hyde, 37 F.3d at 119. The Virgin Islands, as authorized by Congress, certainly has these same interests regarding persons and things coming into this territory. As set forth at V.I. CODE ANN. tit. 33, § 525[13] a customs duty is imposed on goods of foreign origin that come from a U.S. Customs territory (Zone) into the U.S. Virgin Islands. The U.S. Customs Service, acting on behalf of the V.I. Government, needs the ability to make suspicionless searches to avoid and deter the evasion of the duty or the smuggling and importation of contraband. *See, e.g., Paradise Motors, supra* (dealing with alleged under-valuation of imported goods).

In terms of an individual's privacy interest, the Third Circuit in *Hyde* has held that "there is sufficient public knowledge of the distinctive status of the Virgin Islands to alert [first time] travelers to the possibility of border inquiries not experienced at state lines." *Hyde*, 37 F.3d at 122. Accordingly, persons searched at St. Thomas Cyril E. King Airport do *not* have reasonable expectations of individual privacy, "materially

---

[13] Although local legislation, authority to enact was granted by Congress. 48 U.S.C. § 1574(f).

greater than the reasonable privacy expectations of travelers at an international border." *Id.* Hence these diminished expectations of privacy exist both entering and departing from the Virgin Islands.

Judicial notice is also taken of the fact that many illegal guns that enter the Virgin Islands have their origin in the mainland. This is what the U.S. Attorney Office in the Virgin Islands uses in filing gun charges based on "Interstate Commerce" violations. *See* 18 U.S.C. § 921 *et seq.*; *Government of Virgin Islands vs. Frett*, 684 F. Supp. 1324, 1325, 23 V.I. 433 (D.C.V.I. 1988); *United States vs. Bruney*, 866 F. Supp. 874, 876, 30 V.I. 360 (D.C.V.I. 1994); *United States vs. Lynch, et al.*, 908 F. Supp. 284, 290, 33 V.I. 205 (D.C.V.I. 1995). It is also reasonable to infer that a host of other contraband enters the Virgin Islands from the mainland. In short, the same justifications for an international border search in the mainland exist for an internal border search in the Virgin Islands. Because entering the mainland from the Virgin Islands is treated like an international crossing, there is no reason to treat entering the Virgin Islands from the mainland differently.

Equally significant is the fact that the federal government has an interest in what is leaving a U.S. customs territory as well as what is coming in. In *United States v. Ezeiruaku*, 936 F. 2d 136 (3d Cir. 1991), the Government had an interest in searching persons and things departing from the U.S. to a foreign country. *See Ezeiruaku*, 936 F.2d at 142 ("[E]very circuit that has considered the question has ruled that the *rationales for the 'border exception' apply both to incoming and outgoing persons and instrumentalities*") *citing United States v. Hernandez-Salazar*.

 Assuming *arguendo* that no specific authority exists to conduct a "border search" of passengers arriving written the V.I. Custom Zone, Title 19 C.F.R. § 7.2(c) provides, in pertinent part "... [I]n situations where there is no applicable Virgin Islands law or no U.S. law specifically made applicable to the Virgin Islands, U.S. laws and regulations shall be used as a guide and be complied with as nearly as possible." Customs inspectors certainly have the authority to make suspicionless searches at borders. *See* 19 U.S.C. § 1496 (allowing inspection of any person or thing arriving in the U.S.). Ergo, Customs agents have the authority to conduct suspicionless searches of persons and things arriving in the U.S. Virgin Islands ˙from the mainland and other U.S. Custom Zones.

### 3. Even a Non Routine Search at a Border is Valid When Articulable Suspicion Exists

In order to conduct a suspicionless border search, the search must be "routine." *See United States v. Ezeiruaku,* 936 F. 2d 136, 140-141 (3d Cir. 1991). The defendant contends that, assuming *arguendo* that he was subject to a customs search, the search was not "routine" and thus unreasonable under the Fourth Amendment because there is no established check-point where people expect to be searched. The Court rejects this argument for two reasons. First, the concept of a "routine" border search is predicated on the degree of intrusiveness of the search *and not on how often searches are conducted.* In *United States v. Ezeiruaku,* the Third Circuit held that a Customs Inspector's search of baggage about to be loaded on an outbound international flight was "routine." *See id.* It did not matter to the Third Circuit whether the defendant expected the search. That inspection or search was clearly not conducted at a regular check-point. By analogy, David's luggage was allegedly searched outside of a regular checkpoint. No assertion has been made that the search of David's property was particularly intrusive. The degree of intrusiveness determines if the search is non-routine. Generally, luggage searches at the border are considered not very invasive and thus *routine. See United States v. Vega-Barvo,* 729 F.2d 1341, 1345 (11th Cir. 1994) ("No articulable suspicion is required for routine border searches which only intrude slightly on a person's privacy. Both a luggage search and a pat-down or frisk fall within this category and these searches can be legitimately carried out on no more than a generalized "mere suspicion" or "subjective response" of the customs inspector.) *cited in Ezeiruaku, supra.* Non-routine searches include alimentary searches, strip body cavity searches, use of physical force, etc. *See United States vs. Braks,* 842 F.2d 509, 511-13 (1st Cir. 1988); *United States v. Rivas,* 157 F.3d 364, 367 (5th Cir. 1998). Because the search in the case under consideration was only minimally intrusive, it must be considered "routine."

Secondly, even if the Court found the search to be non-routine, the Fourth Amendment was not violated because the Customs Inspector had reasonable suspicion to believe that "criminal activity was afoot." *See Terry,* 392 U.S. at 30, 88 S. Ct. at 1884; *Ezeiruaku,* 936 F.2d at 140. Given the amount of cash David was carrying and the fact that he

possessed a carry-on bag that he did not have when he went through airport and airline security check points in Atlanta, the officials were justified in believing that the situation warranted further investigation. Although not rising to the level of probable cause, the articulable suspicion authorized the Customs Inspector to make not only a routine but a non-routine search of David and his belongings without violating the Fourth Amendment.

## B. EQUAL PROTECTION CLAIM

Counsel for the defendant argued at the hearing held on July 12, 2002 that the search of David and the seizure of the marijuana violated Equal Protection. This argument was not well developed and not addressed in the briefs. However, in an over abundance of caution, the Court will address this issue.

 Like the Fourth Amendment, the Equal Protection clause of the Fourteenth Amendment applies to the Virgin Islands. *See* Revised Organic Act of 1954 § 3 (as amended) (applying the Equal Protection Clause to the Virgin Islands); 48 U.S.C. § 1561. The Fourteenth Amendment states in pertinent part, "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." Claims based on violations of the Equal Protection Clause are reviewed for a rational relation to a legitimate governmental interest unless a fundamental interest is involved or a protected class is targeted. *Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998).

## 1. No Discrimination Involved and No Fundamental Liberty Interest Violated

 The Court notes that the defendant is an African American and thus is a member of a protected class. Simply being a member of a protected class, however, is not sufficient to make a colorable claim under the Equal Protection Clause. In order to show that an equal protection violation has occurred, the defendant must begin by showing that the law enforcement officers singled him out for disparate treatment on the basis of his race. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270-71, 97 S. Ct. 555, 566, 50 L. Ed. 2d 450 (1977). In this case, there is absolutely no suggestion that any disparate treatment existed. Simply put, there is not a shred of evidence that the defendant was treated differently than any other person

would be treated under the circumstances. Accordingly, no discrimination on the basis of race has been implicated. Additionally the search of the defendant and seizure of his possessions did not tread on any fundamental liberty interest of the defendant.

## 2. Rational Basis Test

 The Court finds that the officers' actions in investigating, searching and seizing David and his possessions bore a rational relation to a legitimate governmental interest. Without question, investigating wrongdoing and stopping the flow of contraband is a legitimate governmental interest. Additionally, the behavior of all the officers was rationally related to this interest. As the Court has found, *supra*, there was "reasonable suspicion" that crime was afoot. Accordingly, a rational basis existed for the action taken by the customs inspectors. Having concluded that no equal protection violation existed, the Court finds no need to address the question of whether suppression is an appropriate remedy for violations of the Equal Protection Clause. *See,* Brooks Holland, *Safeguarding Equal Protection Rights: The Search for an Exclusionary Rule Under the Equal Protection Clause,* 37 AM. CRIM. L.R. 1107 (2000); *United States v. Pollard,* 209 F. Supp. 2d 525 (D.C.V.I. 2002).

## III. CONCLUSION

The Court concludes that the Customs Inspector did not possess *probable cause* when she searched the defendant's luggage. Such probable cause, however, was not needed because the search occurred at Cyril E. King Airport, which is the functional equivalent of a border. Additionally, there is an "internal" customs border between the United States customs territory and the Virgin Islands. Customs Inspectors have the authority to make routine, suspicionless searches of persons and things that enter the Virgin Islands from the mainland and other custom zone areas. The search in this case was "routine," despite the fact that it was not at a regularly established checkpoint, because it was mildly intrusive and was based on suspicion. Such searches are "reasonable" within the meaning of the Fourth Amendment. Additionally, the governmental agents who conducted the search and seizure did not violate the Equal Protection Clause of the Fourteenth Amendment. Accordingly, the defendant's motion to suppress is DENIED.