

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-17-2003

# USA v. Pollard

Precedential or Non-Precedential: Precedential

Docket 02-3018

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation
"USA v. Pollard" (2003). *2003 Decisions.* Paper 579.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/579

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed April 17, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-3018

UNITED STATES OF AMERICA,
Appellant

v.

CAMILLE POLLARD

Appeal from the United States District Court
of the Virgin Islands
(D.C. Criminal No. 01-cr-00190)
District Court Judge: Honorable Thomas K. Moore

Argued November 13, 2002

Before: SCIRICA, ALITO and RENDELL, *Circuit Judges.*

(Filed April 17, 2003)

David M. Nissman, Esq. [ARGUED]
Office of the U.S. Attorney
1108 King Street, Suite 201
Christiansted, St. Croix
USVI 00820
   *Counsel for Appellant*

Kim L. Chisolm, Esq.
Office of the U.S. Attorney
U.S. Courthouse
5500 Veterans Bldg., Suite 260
Charlotte Amalie, St. Thomas
USVI, 00802-6924
    *Counsel for Appellant*

Alice S. Fisher, Esq. [ARGUED]
U.S. Department of Justice
Appellate Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
    *Counsel for Appellant*

Nina Goodman, Esq.
U.S. Department of Justice
Criminal Division, Appellate Section
601 D Street, N.W.
Washington, DC 20530
    *Counsel for Appellant*

Douglas J. Beevers, Esq. [ARGUED]
Office of Federal Public Defender
P.O. Box 1327, 51B Kongens Gade
Charlotte Amalie, St. Thomas
USVI 00804
    *Counsel for Appellee*

---

## OPINION OF THE COURT

---

RENDELL, *Circuit Judge*:

On May 13, 2001, Camille Pollard attempted to board an airplane departing from the United States Virgin Islands ("Virgin Islands") and destined for New York City. At the Departure Control Checkpoint ("Checkpoint") located in the airport, an officer of the Immigration and Naturalization Service (INS) questioned Pollard regarding her citizenship. Despite Pollard's representations to the contrary, the officer suspected that Pollard was not a U.S. citizen and escorted her to a room for further questioning. During this questioning, Pollard confessed that she was not a U.S.

citizen and was subsequently arrested. Pollard moved to suppress her confession. The District Court granted the motion, ruling that the Checkpoint violates the Fifth Amendment's equal protection guarantee, and, alternatively, the Fourth Amendment's prohibition against unreasonable seizures. The United States (hereinafter "Government") now appeals. Because we agree with the Government that the Checkpoint does not run afoul of these constitutional protections, we will reverse the order dismissing the charges against Pollard and remand to the District Court.

## I.

The need for the U.S. Government to monitor the movement of aliens over and within its borders is undoubtedly great. While the procedures implemented to meet this need must be scrutinized to ensure that they comply with the Constitution, the legislative and executive branches have historically been given great leeway in developing and carrying them out. *See generally Fiallo v. Bell*, 430 U.S. 787 (1977).

We will provide a legal and factual overview before detailing the particular facts of this case. Much of the law governing the admissibility of aliens derives from the Immigration and Nationality Act (INA).[1] Important to the case before us, section 212 of the INA excludes several classes of aliens from admission to the United States. 8 U.S.C. § 1182. Most pertinent to our inquiry is subsection 212(d)(7), which reads:

> The provisions of subsection (a) of this section (other than paragraph (7)) shall be applicable to any alien who shall leave Guam, Puerto Rico, or the Virgin

---

1. The Immigration and Nationality Act requires that the Attorney General administer and enforce "all [ ] laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a) (2002). The Act authorizes the Attorney General to deny a person admission to the United States for various reasons, including for failure to possess valid entry documents. *Id.* at § 1182. It also permits the Attorney General to prescribe regulations "he deems necessary for carrying out his authority." *Id.* at § 1103(a)(3).

Islands of the United States, and who seeks to enter the continental United States or any other place under the jurisdiction of the United States. The Attorney General shall by regulations provide a method and procedure for the temporary admission to the United States of the aliens described in this proviso. Any alien described in this paragraph, who is denied admission to the United States, shall be immediately removed in the manner provided by section 1231(c) of this title.

Immigration and Nationality Act § 212(d)(7), 8 U.S.C. § 1182(d)(7). The Attorney General has implemented this section through 8 C.F.R. § 235.5, which reads:

235.5 Preinspection.

(a) In United States territories and possessions. In the case of any aircraft proceeding from Guam, Puerto Rico, or the United States Virgin Islands destined directly and without touching at a foreign port or place, to any other of such places, or to one of the States of the United States or the District of Columbia, the examination of the passengers and crew required by the Act may be made prior to the departure of the aircraft, and in such event, final determination of admissibility shall be made immediately prior to such departure. The examination shall be conducted in accordance with sections 232, 235, and 240 of the Act and 8 CFR parts 235 and 240. If it appears to the examining immigration officer that any person in the United States being examined under this section is prima facie removable from the United States, further action with respect to his or her examination shall be deferred and further proceedings regarding removability conducted as provided in section 240 of the Act and 8 CFR part 240. When the foregoing inspection procedure is applied to any aircraft, persons examined and found admissible shall be placed aboard the aircraft, or kept at the airport separate and apart from the general public until they are permitted to board the aircraft. No other person shall be permitted to depart on such aircraft until and unless he or she is found to be admissible as provided in this section.

8 C.F.R. § 235.5(a). The INS developed the procedures at the Checkpoint as the means for conducting the examination required by the regulation, making the Checkpoint, as the District Court noted, the "physical manifestation" of section 235.5. *United States v. Pollard*, 209 F. Supp. 2d 525, 532 (2002).[2]

Unlike in many other border areas of the U.S., the Government does not maintain a border patrol that monitors the shores of the Virgin Islands, but, instead, relies on ports of departure to interdict aliens. *Id.* at 554 n.45. All persons — citizens and non-citizens — traveling from the Cyril E. King Airport ("the Airport") in St. Thomas, Virgin Islands to the continental U.S. or Puerto Rico must pass through the Checkpoint. The Checkpoint is located at a fixed location between the departure check-in counters and the airport security gate leading to the departure area for all flights to the continental U.S. or Puerto Rico. The Checkpoint is identified with a sign reading "United States Immigration Inspections." At the Checkpoint, there are no written protocols or guidelines for inspectors to use in questioning the travelers or otherwise requiring proof of citizenship from persons claiming U.S. citizenship. *Id.* at 533. Usually, inspectors simply ask travelers their destination and their citizenship. *Id.* at 532. Although anyone claiming U.S. citizenship need not show a passport unless the inspecting officer is not "satisfied" that the traveler is a U.S. citizen, *see* 8 C.F.R. § 235.1(b), most show their passports reflexively and without request. *Pollard*, 209 F. Supp. 2d at 532. The primary inspection normally lasts less than fifteen seconds for citizens and less than a minute for non-citizens. A traveler suspected of lying about her citizenship is asked to move out of line for secondary inspection, where an INS agent further questions her and runs her name — or the name she claims is hers — through various computer databases. *Id.* at 533.

The specific facts of this case are undisputed. *See id.* at

---

2. Importantly, Pollard does not argue that the Checkpoint goes beyond the scope of the Attorney General's discretion in enacting regulations to enforce section 212(d)(7) of the INA or that the Checkpoint is an unreasonable implementation of regulation section 235.5.

529-30. On May 13, 2001, Pollard attempted to pass through the Checkpoint in order to board a flight to New York City. At the Checkpoint, Pollard was asked whether she was a U.S. citizen. Pollard responded that she was, handed to the inspector a birth certificate and a non-governmental New York identification card — each with the name "Katisha Kenya Norris" on it — and told the inspector that she had lived in New York City her entire life. The inspector noticed that she did not speak with a New York accent and that she appeared nervous. The inspector also did not recognize the identification card, and, when questioned further, Pollard was unable to name the high school she attended or provide her father's middle name as it appeared on the birth certificate. The inspector then ordered Pollard to undergo secondary inspection. After a series of questions and a computer check that failed to uncover any probative information, the inspector concluded that the New York identification card was false and placed Pollard under arrest. After receiving her *Miranda* warnings, Pollard confessed her true name and that she was a citizen of Guyana. The Government charged her with violating 18 U.S.C. § 911 for falsely representing herself to be a U.S. citizen.[3]

Pollard filed a motion to suppress the statements she made to the INS inspectors. She argued that her statements were taken in violation of her right to counsel under the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1966), and, as a result, should be suppressed as the fruit of an unconstitutional custodial interrogation. In response, the Government argued that Pollard made some of the statements during a non-custodial situation and made the others voluntarily after having received *Miranda* warnings.

The District Court held a hearing and heard testimony regarding Pollard's motion to suppress. The day after the hearing, the District Court, *sua sponte*, ordered the parties to file supplemental briefs addressing three issues: (1) the authority of the INS to maintain a permanent checkpoint at

---

3. The text of 18 U.S.C. § 911 reads as follows: "Whoever falsely and willfully represents himself to be a citizen of the United States shall be fined under this title or imprisoned not more than three years, or both."

the Airport; (2) the constitutional requirements for INS agents to detain travelers; and (3) whether the Checkpoint violated the equal protection guarantee of the Fifth Amendment. After the parties complied with this order and filed their briefs, the District Court entered two further orders, again *sua sponte*. One order required the Government to produce evidence regarding certain aspects of the procedures, protocol, and activity at the Checkpoint, as well as at Luis Munoz Marin International Airport in Puerto Rico and at airports in the continental United States that have flights to the Virgin Islands. The Court noted that this information was necessary to resolve Fourth Amendment and equal protection issues. The other order called for an explanation of the requirement to produce identification at the Checkpoint, information regarding whether residents of Alaska and Hawaii must do the same, and the attendance of "an appropriate representative of the U.S. Immigration and Naturalization Service for this District who can explain and justify the policy of requiring Virgin Islands residents to present identification before boarding planes."

As required, the Government filed a written response to these two orders. The response detailed the "set-up, procedure, and protocol" used by the INS at the Checkpoint. It also contained statistics from the year 2001 detailing the number of persons that passed through the Checkpoint each month, the number of persons referred to secondary inspections, and the number of illegal aliens apprehended on the islands of St. Thomas (outside of the Airport) and St. John. The response further informed the Court that the INS has not promulgated regulations to inspect persons traveling from the continental U.S. to the Virgin Islands because Congress has not enacted a statute requiring such inspection.

The Government, however, declined to produce other information requested by the Court. Regarding the "set-up, procedure, and protocol" in place at the Luis Munoz Marin International Airport in Puerto Rico, the Government stated that it "respectfully declines to produce this information." The Government listed two reasons for its refusal: (1) the information was "not determinative" of whether the

Checkpoint violated Pollard's rights under the Fourth Amendment, and (2) Pollard had the burden to produce any information supporting an equal protection violation. The Government further noted that Pollard had failed even to raise an equal protection argument; thus, it argued that the issue was not properly before the Court.

In response to the Court's order to produce information regarding the source and the legality of the requirement that residents of the Virgin Islands present two forms of identification when traveling to the continental U.S. and whether residents of Hawaii or Alaska were required to do the same, the Government again noted that Pollard had never raised this issue, and that, because Pollard presented herself as a U.S. citizen residing in New York City, the inquiry was not relevant to her case. The Government did inform the Court that residents of Hawaii and Alaska need not produce two forms of identification when traveling to the continental U.S. because 8 C.F.R. § 235.5 does not require a checkpoint in those locales.

Pollard, in turn, filed a memorandum of law that she entitled "Defendant's Reply in Support of the Court's December 17th Orders" (hereinafter "Reply"), arguing that her detention did not comply with the dictates of the Fourth Amendment, and, for the first time, arguing that the Checkpoint violated the guarantee of equal protection, as race-based discrimination, given that "the Virgin Islands is the only United States jurisdiction outside the continental United States which has a black majority."[4]

---

4. Although Pollard mentioned this argument in the Reply, she did not pursue the argument beyond the Reply and has not renewed the argument on appeal. If Pollard had pursued the argument, she would have had to show, *inter alia*, that a racial purpose or object motivated either Congress or the Attorney General. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). The record clearly does not contain such a showing. Pollard argued in her Reply that the group subjected to discrimination consisted of travelers leaving the Virgin Islands. That group, however, includes not only residents of the Virgin Islands, but also a huge number of tourists who travel to and from the Virgin Islands each year — thus making the racial composition of the Virgin Islands not really at issue.

After receiving the submissions, the District Court reopened the suppression hearing and heard additional testimony. At the hearing, the Government called three witnesses. The first, Donnie R. Smith, the Area Port Director for Immigration in the Virgin Islands, testified about a number of aspects of the Checkpoint, including its procedures, set-up, protocol, and 2001 statistics. He further testified that the purpose of the Checkpoint is "to prevent people who are illegally here in the U.S. Virgin Islands from gaining entry into either Puerto Rico or the continental United States." Next, Allison Haywood, the INS inspector who conducted the primary inspection of Pollard, testified as to her encounter with Pollard and her normal operations as an inspector. Lastly, Todd L. Johnson, the Supervisory Special Agent who managed the Investigations, Detention and Removal Programs of the INS in its St. Thomas office, testified to the INS's experiences with illegal aliens in the Virgin Islands generally, the "staggering" number of illegal aliens that come to the Virgin Islands each day,[5] and the positive effect that the Checkpoint has in deterring illegal immigration into the United States and in apprehending illegal immigrants. He further testified that the vast majority of the illegal aliens that the INS encounters in the Virgin Islands intend to travel to the continental United States. Pollard did not present any evidence at the hearing.

The District Court thereafter issued another order. In that order, the District Court, "determined" that the Government bore the burden "of establishing the constitutionality of the checkpoint itself, as well as the statutory and regulatory authority to which the checkpoint was established," and sought further briefing from the Government regarding the history and purpose of the Checkpoint and the rationale for amending the regulation to remove Alaska and Hawaii from its coverage once they became states.[6]

---

5. The District Court dismissed this part of his testimony as "undocumented, unsupported, and exaggerated opinion testimony." *Pollard*, 209 F. Supp. 2d at 546 n.30.

6. The Order, issued on April 16, 2002, reads, in pertinent part:

The Government submitted a written response to the Court's order, outlining the history of 8 C.F.R. § 235.5, from its inception in 1952 to its present form. While the Government could not discover either an articulated original purpose of the regulation or the origin of the Checkpoint, it did assert that the purpose of the Checkpoint was, as stated by Area Port Director Smith in his testimony, "to prevent people who are illegally here in the U.S. Virgin Islands from gaining entry into either Puerto Rico or the Continental United States." *Pollard*, 209 F. Supp. 2d at 535. The Government also stated that the only "apparent rationale" it could perceive for the amendment that removed Alaska and Hawaii from the coverage of section 235.5 was the elimination of the references to those states in section 212(d)(7) of the INA.

Thereafter, the Government supplemented this response with 34 exhibits, submitted with a brief explanation of each exhibit, that it believed "related to the subject." The Government informed the Court that it had no documents that could "provide a complete or continuous history of the origins and purpose" of the Checkpoint and that "documents evidencing procedure and/or protocol

WHEREAS the Court has determined that the government bears the burden here of establishing the constitutionality of the checkpoint itself, as well as the statutory and regulatory authority to which the checkpoint was established, and

WHEREAS the above-described information would assist the Court in resolving whether the checkpoint is necessary under *Martinez-Fuerte*, it is hereby

ORDERED that the United States shall, no later than April 30, 2002, provide supplemental briefing on the history and purpose of the pre-clearance checkpoints in general under 8 C.F.R. § 235.5, as well as the rationale for amending the regulation to remove Alaska and Hawaii from its coverage once they became states, and it is further

ORDERED that the United States shall have until April 30, 2002 to provide the Court with information regarding the origins and purpose of the permanent immigration checkpoint at the Cyril E. King Airport.

throughout the history of the checkpoint has [sic] either not been memorialized or retained." The Government concluded its supplemental response with the following: "The United States submits that the above documents do not bear on the issues before the Court." As far as we can discern from the record, this submission constituted the last evidence or argument received by the District Court.

On June 18, 2002, the District Court, in a published opinion, granted Pollard's motion to suppress. *Pollard*, 209 F. Supp. 2d at 527, 548. The Court determined that section 212(d)(7) of the INA and the implementing regulation, 8 C.F.R. § 235.5 (together referred to hereinafter as "the statute"), violated the equal protection guarantee of the Due Process Clause of the Fifth Amendment. The Court also held that the procedure put in place pursuant to this statute — the Checkpoint — violated the protection against unreasonable seizures found in the Fourth Amendment.[7] *Pollard*, 209 F. Supp. 2d at 527, 559.

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 3731. Because we are reviewing the District Court's interpretation and application of legal principles, our review is plenary. *Anderson v. City of Philadelphia*, 845 F.2d 1216, 1220 (3d Cir. 1988). In conducting our review, however, we must keep in mind the "limited scope of judicial inquiry into immigration legislation," *Fiallo*, 430 U.S. at 792, *see also De Leon-Reynoso v. Ashcroft*, 293 F.3d 633, 638 (3d Cir. 2002), and that "Congress has developed a complex scheme governing admission to our Nation and status within our borders," *Plyler v. Doe*, 457 U.S. 202, 225 (1982), that requires "delicate policy judgments [counseling] the Judicial Branch to avoid intrusion into this field." *Id.*[8]

---

7. The District Court did not address the Fifth Amendment *Miranda* issue actually raised and argued by Pollard. Rather, the Court stated that Pollard abandoned the argument "after it became clear that Pollard's statement (to the INS inspectors) was the voluntary product of a valid waiver of her *Miranda* rights." *Pollard*, 209 F. Supp. 2d at 530.

8. Although raised in a different context, we previously characterized the relationship between the judiciary and the other branches of government in the context of immigration in our opinion in *New Jersey v. United States*:

## II.

### A. Equal Protection

The Due Process Clause of the Fifth Amendment to the Constitution contains the same guarantee of equal protection under law as that provided in the Fourteenth Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954). The Due Process Clause was made applicable to the Virgin Islands by the 1968 amendments to the Revised Organic Act of 1954.[9] 48 U.S.C. § 1561. *See generally United States v. Hyde*, 37 F.3d 116, 123 (3d Cir. 1994).

For purposes of the equal protection analysis, the relevant classifications are those among persons similarly situated. *Plyler*, 457 U.S. at 216. As a result, equal protection analysis often begins with identifying the similarly situated persons. The District Court determined that the relevant classification contained in the statute — in its words "the relevant comparison" — was "between persons traveling on flights within the United States originating in the Virgin Islands and persons traveling on flights within the United States originating in any State or

---

> Decisions about how best to enforce the nation's immigration laws in order to minimize the number of illegal aliens crossing our borders patently involve policy judgments about resource allocation and enforcement methods. Such issues fall squarely within a substantive area clearly committed by the Constitution to the political branches; they are by their nature peculiarly appropriate to resolution by the political branches of government both because there are no "judicially discoverable and manageable standards for resolving" them and because independent resolution of such issues by a court would express a lack of the respect due a coordinate branch of government.

91 F.3d 463, 470 (3d Cir. 1996) (citation omitted).

9. The relevant parts of the amended statute read: "The following provisions of and amendments to the Constitution of the United States are hereby extended to the Virgin Islands to the extent that they have the same force and effect there as in the United States or in any State of the United States . . . the first to ninth amendments inclusive . . . ." 48 U.S.C. § 1561.

the District of Columbia." *Pollard*, 209 F. Supp. 2d at 546. The obvious difference in the Government's treatment of these "classes" of persons is that the Government does not subject those in U.S. jurisdictions outside of the Virgin Islands to questioning at a fixed checkpoint like the Checkpoint. The District Court found this distinction constitutionally impermissible.[10] The District Court rejected the Government's argument that the relevant comparison was solely between travelers leaving the Virgin Islands. *Id.* Although the Government has challenged on appeal the Court's identification of the similarly situated persons, we find its other arguments persuasive and will therefore *assume* that the comparison articulated by the District Court was appropriate.

The District Court applied a rational-basis analysis to the alleged classification in the statute. The Court correctly rejected Pollard's argument that strict scrutiny applied. *Romer v. Evans*, 517 U.S. 620, 631 (1996) (stating that strict scrutiny applies to a classification that implicates a suspect class or burdens a fundamental right). Under rational-basis review in an equal protection context, "a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). In other words, the inquiry is "whether the difference in treatment . . . rationally furthers a legitimate state interest." *Nodlinger v. Hahn*, 505 U.S. 1, 12 (1992). The District Court found that the Checkpoint failed even this low level of scrutiny, and concluded that it "unconstitutionally discriminate[d] against visitors to and residents of the Virgin Islands." *Pollard*, 209 F. Supp. 2d at 548.

Normally, under rational-basis review, the party alleging an equal protection violation has the burden of showing the

---

10. The District Court conducted an extensive examination of the equal protection issues and the opinion is replete with references to the United States Government's allegedly discriminatory historical practices towards the U.S. Virgin Islands, finding all three branches of government to be implicated. *See Pollard*, 209 F. Supp. 2d at 539-46. We find much of this discussion to be not founded in evidence before the Court and not necessary to our ruling.

irrationality of the classification drawn by the statute. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440-41 (1985). Here, as we already noted, the Court placed the burden of proof on the Government to justify the different treatment. *Pollard*, 209 F. Supp. 2d at 537-38. The Court articulated two reasons for doing so: "Congress's intent to treat the Virgin Islands, and persons departing therefrom, differently from similar travelers in a State appears on the face of both the statute and regulation," and "this issue was raised on the defendant's motion to suppress evidence obtained as the result of a warrantless seizure." *Id.*

Neither of these reasons finds support in our, or the Supreme Court's, jurisprudence. To the contrary, we have said: "Under rational basis review, legislation enjoys a presumption of validity, and the plaintiff must negate every conceivable justification for the classification in order to prove that the classification is wholly irrational." *Brian B. v. Pennsylvania Dep't of Educ.*, 230 F.3d 582, 586 (3d Cir. 2000); *see also Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973) ("[T]he burden is on the one attacking the legislative arrangement . . . ."); *De Leon-Reynoso*, 293 F.3d at 638 (stating that Congress "need not justify the purpose or reasoning to support its classification"). This presumption is not altered when the alleged discrimination is on the face of the statute or the issue arises in a criminal context. The Supreme Court has made clear that "rational-basis review . . . does not require the State to place any evidence in the record," *Heller*, 509 U.S. at 319, or place on the Government an "obligation to produce evidence to sustain the rationality of a statutory classification." *Id.* at 320. It would make no sense to alter the burden of proving constitutionality based on the context in which it was raised. A law is not presumed more or less constitutional because it comes into play in a civil or criminal context. Here, Pollard had the burden to "negative every conceivable basis that might support" the classification, *id.*, and the District Court should have required her to carry that burden.

While we would normally remand based on the District Court's imposition of the burden on the Government to

prove that the Checkpoint did not violate the guarantee of equal protection, we will not do so because we conclude that there is no way that Pollard can succeed in arguing that the statute fails rational-basis review. The threshold for upholding distinctions in a statute under rational-basis review is extremely low, and it is not within the purview of the courts to conduct anything but a limited review of the reasons that legislation subject to rational-basis review classifies among similarly situated persons. *See Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 316 (1976) ("[Rational-basis] inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary. . . . Such action by a legislature is presumed to be valid.").

Pollard, as the one attacking the alleged classification created by the statute, would bear the burden "to negative every *conceivable* basis which might support it." *Lehnhausen*, 410 U.S. at 364 (emphasis added); *see also De Leon-Reynoso*, 293 F.3d at 640 (stating that Congress only needed to have "conceivably had good reasons to create . . . the distinction"). In fact, even if the Government fails to come forward with its own rationale, "[t]he court may . . . hypothesize the motivations of the . . . legislature to find a legitimate objective promoted by the provision under attack." *Malmed v. Thornburgh*, 621 F.2d 565, 569 (3d Cir. 1980). That is, "[w]e are free to consider any conceivable legislative purpose so long as it reasonably could have been entertained by the legislature." *Ramsgate Court Townhome Ass'n v. West Chester Borough*, 313 F.3d 157, 160 (3d Cir. 2002). Therefore, under rational basis review, Pollard not only must show that any justifications for the classification forwarded by the Government were not rational, but she also must convince the court that no set of facts rationally could justify the classification. This feat, she simply cannot accomplish.

In support of the statute, the Government argues that the statute is intended to control illegal immigration in the Virgin Islands and to prevent illegal immigrants from traveling to the U.S. mainland. The District Court did not

accept this rationale. Instead, it conducted an in-depth probe into whether the statute and its implementing regulations accomplished this purpose and was justified. *See Pollard*, 209 F. Supp. 2d at 546 n.30. This approach was flawed. *See F.C.C. v. Beach Communications*, 508 U.S. 307, 313-14 (1993) ("A legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."); *id.* at 320 ("[The] assumptions underlying these rationales may be erroneous, but the very fact that they are 'arguable' is sufficient, on rational-basis review, to 'immuniz[e]' the congressional choice from constitutional challenge." (quoting *Vance v. Bradley*, 440 U.S. 93, 112 (1979))).

While the Government's insistence that the statute's purpose is to control immigration into the U.S. mainland seems more of a justification for the statute itself than for the alleged classification created in the statute, it is easy to conceive of reasons supporting the classification. Congress, in enacting the statute, and the Attorney General, in promulgating the implementing regulation, could have rationally believed that the Checkpoint was the best way to deter illegal immigration from the Virgin Islands into the continental U.S. In reaching this conclusion, Congress and the Attorney General could have had in mind the difficulty and expense of preventing the entry of illegal aliens into the Virgins Islands' shoreline and harbors, as well as the proximity of foreign islands and the great number of vessels of all types that ply the water surrounding the Virgin Islands. They also could have rationally believed, as testimony confirmed, that many of the illegal aliens who enter the Virgin Islands intend to travel to the U.S. mainland and that the Checkpoint would deter many of these illegal aliens from entering the Virgin Islands. With any of these conceivable reasons in mind, requiring persons traveling from the Virgin Islands to pass through the Checkpoint at the Airport is undoubtedly a rational means of furthering the interest in interdicting aliens. Whether or not the aforesaid reasons were in the contemplation of Congress when it enacted the legislation is irrelevant.[11] *See*

---

11. Therefore, the District Court's examination of the known history of the statute and the U.S. Government's relationship with the Virgin

*Beach Communications*, 509 U.S. at 315 ("[B]ecause we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."); *see also Heller*, 509 U.S. at 321 (stating that the legislation only needs to have "some footing in the realities of the subject addressed by the legislation"); *Flemming v. Nestor*, 363 U.S. 603, 612 (1960) ("For these purposes, it is, of course, constitutionally irrelevant whether this reasoning in fact underlay the legislative decision . . . ."); *De Leon-Reynoso*, 293 F.3d at 640 (stating that the rationales need not "command enthusiasm," as along as "they form a plausible justification for the distinction"). The District Court conducted an improper investigation into whether the Virgin Islands should be viewed differently from other places in the U.S. for the purposes of controlling illegal immigration. Instead, the Court should have asked itself if Congress conceivably could have thought that the Virgin Islands differed. The answer is clearly yes.[12]

Islands adds little, if anything, to the rational-basis inquiry. *Pollard*, 209 F. Supp. 2d at 539-48. The legislature did not need to justify the classification when it passed the statute. *Beach Communication*, 509 U.S. at 315; *see also id.* at 313 (stating that rational-basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices"). It is quite clear that justifications may be surmised post-hoc.

12. Moreover, Pollard's argument that the fact that, unlike in other U.S. jurisdictions, there is no border patrol in the U.S. Virgin Islands can be presumed to be a part of any alleged discrimination toward the people of that territory is irrelevant. She confuses the analysis. The similarly situated persons identified by the District Court are not all persons in the Virgin Islands and all persons in other U.S. jurisdictions, but, rather, airplane travelers from the Virgin Islands and airplane travelers in states and the District of Columbia. *Pollard*, 209 F. Supp.2d at 546. Thus, any alleged discrimination against the whole population of the Virgin Islands is not at issue. Regardless, Pollard's argument fails either way. Under rational-basis review, the Government need not treat all jurisdictions exactly alike. Doing so would inappropriately subject the wisdom of legislative choices to the whim of the courts. *See Beach Communications*, 508 U.S. at 313. As is explicit in the courts' use of scrutiny levels in determining the constitutionality of legislation, different treatment is not necessarily impermissible discrimination. The Government may decide to

Accordingly, we reverse the District Court's finding that section 212(d)(7) of the INA and its enacting regulation, 8 C.F.R. § 235.5, violate the equal protection guarantee embedded in the Due Process Clause of the Fifth Amendment. The alleged distinction drawn by the statutory provision passes constitutional muster because Congress and the Attorney General rationally could have believed that illegal immigration in the Virgin Islands needs to be dealt with differently in the U.S. Virgin Islands than in other U.S. jurisdictions. *See generally Williamson v. Lee Optical of Oklahoma, Inc.*, 348 US. 483, 489 (1955) ("Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think."). Taking our cue from the Supreme Court that "[w]here there are 'plausible reasons' for Congress' action, our inquiry is at an end," *Beach Communications*, 508 U.S. at 313-14 (quoting *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)), we accordingly turn our attention to the Fourth Amendment issue.

## B. Fourth Amendment

The District Court granted Pollard's motion to suppress

put in place a border patrol in one jurisdiction, such as Texas, but that does not mean that the Government *per se* impermissibly discriminates against Virgin Islanders in favor of Texans. Just as Congress and the Executive may attack a perceived problem in piece-meal fashion without running afoul of equal protection guarantees, *see Williamson v. Lee Optical of Oklahoma, Inc.*, 348 US. 483, 489 (1955) (stating that "reform may take one step at a time," permitting the legislature to "select one phase of one field and apply a remedy there, neglecting the others"), it may attack the problem — here, illegal immigration — in different ways in different jurisdictions. *See Reno v. Flores*, 507 U.S. 292, 312 (1993) (stating that, in the context of immigration regulation, "reordering of priorities is for Congress"); *Flemming v. Nestor*, 363 U.S. 603, 612 (1960) ("For these purposes, it is, of course, constitutionally irrelevant . . . that the section does not extend to all to whom the postulated rationale might in logic apply."); *cf. Harris v. Rosario*, 446 U.S. 651, 652-53 (1980) (holding that Congress may treat Puerto Rico "differently from states so long as there is a rational basis for its actions").

on the alternative ground that the Checkpoint violated the Fourth Amendment.[13] It seems clear that Pollard was subjected to a "seizure" when she was at the Checkpoint, *see id.* at 556, *see also Lopez v. Aran*, 844 F.2d 898, 905 (1st Cir. 1988) ("Checkpoint stops are indubitably 'seizures' within the meaning of the Fourth Amendment."), and it is undisputed that the seizure occurred without individualized suspicion. We therefore must determine whether the Government is excused from having individualized suspicion in order to detain persons at the Checkpoint.

The Fourth Amendment's "central concern . . . is to protect liberty and privacy from arbitrary and oppressive interference by government officials." *United States v. Ortiz*, 422 U.S. 891, 895 (1975). The touchstone of Fourth Amendment analysis is reasonableness. *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990). For the most part, searches and seizures undertaken without a warrant and probable cause or reasonable suspicion are unreasonable and violative of the Fourth Amendment. *See Martinez-Fuerte*, 428 U.S. at 560; *see also* U.S. Const. amend. IV. The Supreme Court, however, has articulated various exceptions to the Fourth Amendment's general requirements of probable cause and reasonable suspicion, including border searches, *see generally United States v. Ramsey*, 431 U.S. 606, 617-19 (1977), and searches at internal checkpoints on the highways aimed at the interdiction of illegal aliens. *Martinez-Fuerte*, 428 U.S. at 561-62. In determining whether an exception exists, the Court balances the intrusion on the individual's Fourth Amendment rights against the legitimate governmental interests at stake. *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985); *see also Brown v. Texas*, 443 U.S. 47, 50-51 (1979). Where the balance tilts in favor of the government, the Court considers the suspicionless

---

13. We use the term "Checkpoint" to connote all of the set-up and procedures used pursuant thereto, except for those occurring during the secondary inspection. Pollard focused her argument before the District Court, as she does on appeal, on the constitutionality of the primary questioning at the Checkpoint, not the secondary inspection. Therefore, we do the same.

search reasonable. *See, e.g., Martinez-Fuerte*, 428 U.S. at 561.

Because there is no case law on point, we will apply a balancing test to the facts presented. In subjecting the Checkpoint to this balancing test, however, we do not write on a blank slate. We find guidance in a number of opinions, but will focus on three. For our ultimate conclusion that the Checkpoint passes muster under the Fourth Amendment, we rely chiefly on the opinion of the Supreme Court in *United States v. Martinez-Fuerte*, 428 U.S. 543, 551 (1976). We find, however, that the opinion of our Court in *United States v. Hyde*, 37 F.3d 116 (3d Cir. 1994), and the opinion of the Court of Appeals for the First Circuit in *Lopez v. Aran*, 844 F.2d 898 (1st Cir. 1988), buttress this conclusion.

### 1. *United States v. Martinez-Fuerte*

The District Court likewise relied primarily upon the Supreme Court's opinion in *Martinez-Fuerte*. *See Pollard*, 209 F. Supp. 2d at 552-59. But, unlike the District Court, we view *Martinez-Fuerte* as supporting the constitutionality of the Checkpoint.

In *Martinez-Fuerte*, the Supreme Court addressed the constitutionality of procedures employed in connection with various (consolidated) criminal prosecutions for transporting illegal aliens from Mexico. *Id.* at 545. The defendants were apprehended at fixed checkpoints on the highway located 25 to 100 miles from the Mexican border whose purpose was to interdict aliens. The Court addressed the issue of whether, under the Fourth Amendment, "a vehicle may be stopped at a fixed checkpoint for brief questioning of its occupants even though there is no reason to believe the particular vehicle contains illegal aliens." *Id.*

The Court held that it may. The Court reached this conclusion after applying the aforementioned balancing test, "weigh[ing] the public interest against the Fourth Amendment interest of the individual." *Id.* at 554. In doing so, the Court made a number of observations. First, the Court examined the public interest and the practicality of requiring individualized suspicion. The Court noted "the

substantiality of the public interest in the practice of routine stops for inquiry at permanent checkpoints [designed to control the flow of illegal aliens across the border]." *Id.* at 556. The Court also noted that requiring reasonable suspicion would be impractical given the "heavy" flow of traffic and the fact that such a requirement would "largely eliminate any deterrent to the conduct of well-disguised smuggling operations." *Id.* at 557. Thus, the Court found that "the need to make routine checkpoint stops is great." *Id.*

Next, the Court examined the resulting intrusion on Fourth Amendment interests. The Court noted that the checkpoint stops did intrude to some extent on "motorists' right 'to free passage without interruption' and arguably on their right to personal security." *Id.* at 557-58 (citation omitted) (quoting *Carroll v. United States*, 267 U.S. 132, 154 (1925)). Nonetheless, the Court dismissed this intrusion as "quite limited." *Id.* at 557. The Court found that the stop did not involve a search, but, instead, involved "only a brief detention during which '(a)ll that is required of the vehicle's occupants is a response to a brief question or two and possibly the production of a document evidencing the right to be in the United States.' " *Id.* at 558 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975)). The Court further emphasized that the intrusion did not occur in private dwellings, where the expectation of privacy is much greater. *Id.* at 561.

The Court also referenced the distinction drawn in the case law between the permanent checkpoints at issue and the roving patrol stops found repugnant to the Fourth Amendment in *Brignoni-Ponce*, 422 U.S. at 882-83. The Court noted that "the subjective intrusion — the generating of concern or even fright on the part of lawful travelers — is appreciably less in the case of a checkpoint stop," *Martinez-Fuerte*, 428 U.S. at 558, because the traveler "can see visible signs of the officers' authority." *Id.* (quoting *Ortiz*, 422 U.S. at 894-95). *See generally Sitz*, 496 U.S. at 450 (discussing roving patrols). The Court also cited the following characteristics of the permanent checkpoint as distinguishing: "the potential interference with legitimate traffic is minimal," *Martinez-Fuerte*, 428 U.S. at 558-59;

"checkpoint operations both appear to and actually involve less discretionary enforcement activity" given that the checkpoint is operated in a "regularized manner" not chosen by field officers, but by "officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources," *id.* at 559; "since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of individuals," *id.*; and "a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review." *Id.*

Ultimately, the Court found that the government's interests outweighed those of the individual citizens, *id.* at 545, 561-62, and therefore held that the stops and questioning at issue were constitutional without individualized suspicion at "reasonably located checkpoints." *Id.* at 562.

Applying the analysis of *Martinez-Fuerte* to the facts before us, it seems clear that the checkpoint here does not offend the Fourth Amendment. We begin, as the Supreme Court did, by analyzing the public interest advanced by the Checkpoint. The Government's interest at issue is in interdicting aliens illegally entering or present in the U.S. — essentially the same interest identified in *Martinez-Fuerte. Id.* at 556. As the Supreme Court noted: "It has been national policy for many years to limit immigration into the United States," *id.* at 551, and "[m]any more aliens than can be accommodated under the quota [annually set for immigrants] want to live and work in the United States." *Id.* The public interest is clearly compelling.

Next, we identify the intrusion. As in *Martinez-Fuerte*, the Checkpoint stop "involves only a brief detention of travelers during which 'all that is required . . . is a response to a brief question or two and possibly the production of a document evidencing the right to be in the United States.'" *Id.* (quoting *Brignoni-Ponce*, 422 U.S. at 880). The Checkpoint also minimizes "the physical and psychological intrusion," *Delaware v. Prouse*, 440 U.S. 648, 657 (1979), visited upon travelers because it serves as "visible evidence, reassuring to lawabiding [travelers], that the stops are duly authorized and believed to serve the public interest."

*Martinez-Fuerte*, 428 U.S. at 559. It is not likely to result in the "generating of concern or even fright on the part of lawful travelers." *Id.* at 558; *see also Prouse*, 440 U.S. at 656 (finding that the minimal "subjective intrusion" felt by lawful travelers is "the crucial distinction" between impermissible roving-patrol stops and the Border Patrol checkpoint operations). Additionally, the Checkpoint in the Airport mimics the checkpoints at issue in *Martinez-Fuerte* in that it interferes minimally with traffic, and is conducted in a regularized manner at a fixed location "not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources," *Martinez-Fuerte*, 428 U.S. at 559, thus minimizing the possible evils of absolute discretion. *Id.* at 559; *see also Prouse*, 440 U.S. at 656 (discussing the "danger" of leaving officers in the field with discretion to make stops). These determinations, along with the fact that one's expectation of privacy in immigration status and identification while traveling via airplane from the U.S. Virgin Islands to the other parts of the U.S. is extremely low, *see Martinez-Fuerte* 428 U.S. at 561, leads to the ineluctable conclusion that stops and questioning conducted at the Checkpoint are consistent with the principles of the Fourth Amendment articulated in *Martinez-Fuerte*, and, thus, may be made in the absence of any individualized suspicion.

## 2. *United States v. Hyde*

Although largely ignored by the parties and the District Court, our decision in *United States v. Hyde*, 37 F.3d 116 (3d Cir. 1994), squarely supports the constitutionality of the Checkpoint under Fourth Amendment analysis. In *Hyde*, we addressed "whether an individual leaving the Virgin Islands for one of the fifty states may be subjected to a routine customs search prior to departure in the absence of any degree of suspicion that the individual engaged in wrongdoing." *Id.* at 118. As in *Martinez-Fuerte*, we emphasized that the constitutionality of the search depended on the results of "balancing the 'intrusion on the individual's Fourth Amendment interests' [against] the degree to which routine customs searches 'promot[e]

legitimate governmental interests.' " *Hyde*, 37 F.3d at 122. We concluded that the Government's interest in conducting warrantless searches without probable cause outweighed the individual's interest in not being subject to the intrusion on Fourth Amendment interests. *Id.* at 122.

The District Court read our analysis in *Hyde* as applying strictly to customs searches. According to the Court, *Hyde* is "factually inapposite . . . because the Congress has always included the Virgin Islands within the United States for immigration purposes, but not for customs purposes . . . . Whatever else it may endorse, *Hyde* does not stand for the proposition that there is an 'internal' border between the Virgin Islands and the continental United States for immigration purposes." *Pollard*, 209 F. Supp. 2d at 545. Inasmuch as the District Court believed that *Hyde* does not support the constitutionality of the Checkpoint, we disagree. While *Hyde* focused on customs searches, its reasoning certainly applies to the immigration questioning conducted at the Checkpoint.

In applying the balancing test in *Hyde*, we noted that "not all territory over which a sovereign exercises sovereignty has the same legal status, and borders between 'incorporated' and 'unincorporated' territory[, such as the Virgin Islands,] of a sovereign have many of the characteristics of international borders." 37 F.3d at 120. Thus, we concluded that Congress's "broad power to regulate commerce between the United States and its unincorporated territories," *id.* at 122, enabled it to constitutionally create a border for customs purposes between the Virgin Islands and the United States. *Id.* We focused on what we perceived to be the interest of the Government in warrantless searches at the Airport and found that interest "to be little different from its interest in such searches at its international borders." *Id.*

After we determined that the Government has a significant interest in customs searches, we noted that the reasonable expectation of individual privacy of the defendants in *Hyde* was not "materially greater than the reasonable privacy expectations of travelers at an international border." *Id.* We also noted that customs searches had been conducted consistently on the Islands

since the U.S. acquired them, and that the public was sufficiently aware of the distinctive status of the Islands "to alert such travelers to the possibility of border inquiries not experienced at state lines." *Id.*

Although there are differences between customs interests and immigration interests, we see no reason why the balancing test would yield different results when applied to the Checkpoint. While the power of Congress used in *Hyde* was the power to regulate commerce, here, the power at issue is the power to regulate immigration — which is at least equally as compelling. Applying the balancing test, the Government clearly has as great an interest in interdicting aliens as it does in regulating customs. The intrusion on an individual's interests that results from the questioning at the Checkpoint likewise does not seem to exceed the intrusion that results from a customs inspection. Moreover, the expectation of privacy is equally as low. As a result, *Hyde* also supports the constitutionality of the Checkpoint.

### 3.  *Lopez v. Aran*

Lastly, we believe that the well-reasoned opinion of the Court of Appeals for the First Circuit in *Lopez v. Aran,* 844 F.2d 898 (1st Cir. 1988), also provides support for the constitutionality of the Checkpoint. *Lopez* involved a civil suit challenging the procedures of the departure checkpoint at the international airport in Isla Verde, Puerto Rico ("Isla Verde checkpoint"), which, like the Checkpoint in St. Thomas, was also set up under the auspices of section 212 of the INA and 8 C.F.R. § 235.5. The plaintiff in *Lopez v. Aran* sought a declaratory judgment that the Isla Verde checkpoint violated various constitutional provisions, including the Fourth Amendment. The Court of Appeals for the First Circuit described the Isla Verde checkpoint as follows:

> INS agents at the Isla Verde International Airport conduct an initial inspection to determine the immigration status of prospective passengers by asking them about their citizenship. The question is usually posed, as we understand it, while the subject is walking toward the departure gate. He or she need not

> halt — nor necessarily slow down — in order to respond. When a traveller affirms that he or she is a citizen of the United States, and no further suspicion is aroused, the questioning stops and the individual remains free to proceed. On the other hand, if an agent comes to suspect that the traveller is an alien (or if the legality of the person's immigration status cannot readily be determined), then the individual is referred to secondary inspection. In that phase of the inquiry, the INS officer takes the passenger to another section of the airport for further interrogation.

*Lopez*, 844 F.2d at 906. We view this procedure as materially the same as that employed at the Checkpoint in St. Thomas, except that the Isla Verde checkpoint operates in a less systematic manner.

The *Lopez* Court found the checkpoint stop at Isla Verde "strikingly similar" to the checkpoint stops at issue in *Martinez-Fuerte* and upheld the constitutionality of the inspection chiefly for that reason. *Lopez*, 844 F.2d at 905. Comparing the Isla Verde checkpoint to the checkpoints at issue in *Martinez-Fuerte*, the court noted the following: the inspections occurred at "fixed, plausibly located checkpoints, the existence of which, arguably at least, was practically necessary to control the flow of persons," *Lopez*, 844 F.2d at 906 (internal quotations and citation omitted); "the public interest justifying the questioning is legitimate and important," i.e., "the need to interdict the flow of illegal aliens into the mainland United States," *id.*; significant numbers of illegal aliens had been apprehended at the checkpoint, *id.*; traffic was forewarned of the interrogation, *id.*; the checkpoints "were operated under a prearranged format and in a 'regularized manner,'" *id.* at 907; the intrusion was minimal, *id.*; the scope of the inspections "has been carefully tailored to the goal of intercepting illegal aliens," *id.*; and the expectation of privacy within an airport is "at least equally low" as that on a highway. *Id.*

The District Court, here, however, "categorically reject[ed] the United States' contention that the checkpoint in *Lopez* is sufficiently similar to the Departure Control Checkpoint here to help [] decide this case." *Id.* at 559. According to the Court, "the salient fact distinguishing the two

checkpoints is that all travelers are stopped at the St. Thomas Departure Control checkpoint," while *Lopez* involved only some passengers being questioned "on the fly." *Id.* We fail to see the significance of the distinction drawn by the District Court, as the differences between the two checkpoints are immaterial to the Checkpoint's constitutionality. If anything, the primary inspection at checkpoint in Puerto Rico would seem more likely to offend constitutional principles than the one in the Virgin Islands given both its greater susceptibility to arbitrary and discriminatory enforcement and its greater likelihood to arouse feelings of discomfort, fright, or annoyance in law-abiding citizens due to this seeming arbitrariness. *See Sitz*, 496 U.S. at 453. Therefore, we find that *Lopez* buttresses our conclusion that the Checkpoint does not offend principles of the Fourth Amendment.

## III.

The importance of the issues raised in this case have been highlighted by the immigration concerns that have arisen in the country subsequent to the central events at issue here, but the principles applicable in the pre-September 11th fact pattern before us nonetheless include deference that courts are to give the legislative branch in immigration matters, and the careful weighing undertaken in addressing whether checkpoints such as this also comport with the Fourth Amendment. In analyzing the classification reflected in section 212 of the INA and 8 C.F.R. § 235.5, we have emphasized the nature of the judiciary's review of a classification's constitutionality where rational-basis review is appropriate. Quite simply, as long as a conceivable rationale — which assumes reasonableness — could support the classification, the court should uphold the legislation's constitutionality. As for the Fourth Amendment question involved, we have relied on the Supreme Court's jurisprudence, namely *Martinez-Fuerte*, and, also, but to a lesser extent, on our opinion in *Hyde* and the opinion of the Court of Appeals for the First Circuit in *Lopez*. In so doing, it becomes evident that, when the Government's compelling interest in interdicting aliens — an interest undoubtedly addressed by

the Checkpoint — is measured against the Checkpoint's minimal intrusion on the liberty interests of travelers, the Checkpoint comfortably squares with the Fourth Amendment.

We accordingly will reverse the order of the District Court and remand for further proceedings.

A True Copy:
    Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*