

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-25-2004

# USA v. Mora-Santana

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-4120

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Mora-Santana" (2004). *2004 Decisions.* Paper 681.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/681

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-4120

UNITED STATES OF AMERICA

v.

JUANITO MORA-SANTANA
a/k/a
ERNESTO ACEVEDO PETRAZA

Juanito Mora-Santana,
Appellant

APPEAL FROM THE DISTRICT COURT OF THE VIRGIN ISLANDS
D.C. Crim. No. 03-cr-00115
District Judge:  The Honorable Thomas K. Moore

Submitted Under Third Circuit LAR 34.1(a)
May 7, 2004

Before: BARRY, AMBRO, and SMITH, Circuit Judges

(Opinion Filed May 25, 2004)

OPINION

BARRY, Circuit Judge

Juanito Mora-Santana, a native of the Dominican Republic, presented a fake Puerto Rican birth certificate to a United States immigration inspector at the Cyril E. King airport in St. Thomas, U.S. Virgin Islands.  Following a bench trial, he was convicted of a violation of 18 U.S.C. § 1001 for having made a false claim of United States citizenship.[1] He now appeals.   The District Court had jurisdiction under 48 U.S.C. § 1612, and we have jurisdiction under 28 U.S.C. § 1291.  We will affirm.

## I. Background

On July 3, 2003, Mora-Santana waited in line for twenty minutes at a Department of Homeland Security ("D.H.S.") "customs and border protection" checkpoint at the St. Thomas airport.  A D.H.S. inspector, Inspector Ortiz, observed Mora-Santana as he proceeded through the line, and noticed that he seemed "nervous."  Inspector Ortiz was

---

[1] 18 U.S.C. § 1001 provides in relevant part:

> (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully–
>> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
>> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
> shall be fined under this title or imprisoned not more than 5 years, or both.

18 U.S.C. § 1001.

occupied with other matters when Mora-Santana reached the front of the line, and another immigration official conducted the inspection. Mora-Santana presented proof of citizenship, and was waived through the checkpoint. A short time later, Inspector Ortiz asked the official who had processed Mora-Santana what proof of citizenship he had presented. The official could not recall. As a result, Ortiz went looking for Mora-Santana and found him at the Transportation Security Administration ("T.S.A.") metal detector and security checkpoint.

Ortiz questioned Mora-Santana and asked to see his proof of citizenship. Mora-Santana produced a voter registration card and a Puerto Rican birth certificate. Ortiz, Puerto Rican by birth, suspected that the birth certificate was fraudulent. He asked Mora-Santana three questions about Puerto Rico. Mora-Santana only knew the answer to one. Mora-Santana thereafter admitted that the documents were fraudulent, and that he was a native of the Dominican Republic. Based in large part on this admission, Mora-Santana was convicted of violating 18 U.S.C. § 1001.

## II. Analysis

Mora-Santana argues that the D.H.S. checkpoint, which combines the tasks of immigration and customs control, functions as a generalized crime control tool, which, he asserts, is prohibited under *Indianapolis v. Edmond*, 531 U.S. 32 (2000). He also argues that, by detaining him a second time (at the metal detector) without reasonable suspicion, the government engaged in a roving detention in a border area, which is precluded by

*United States v. Brignoni-Ponce*, 422 U.S. 873 (1975).[2] The facts of this case are not in dispute. We exercise plenary review over Mora-Santana's legal arguments. *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003).

A.    Immigration and Customs

We review checkpoint searches by "applying [a] balancing test, 'weigh[ing] the public interest against the Fourth Amendment interest of the individual.'" *United States v. Pollard*, 326 F.3d 397, 411 (3d Cir. 2003) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976)). *See also United States v. Hyde*, 37 F.3d 116, 122 (3d Cir. 1994) (balancing the intrusion on the individual's Fourth Amendment interests against the degree to which routine customs searches promote legitimate governmental interests).

The checkpoint at issue in this case is a border checkpoint.[3] "It is axiomatic that

_____

[2]Mora-Santana asserts that the twenty minutes he spent waiting in line before reaching the checkpoint constitutes an illegal seizure. This contention is utterly without merit. Waiting in line at a customs and immigration checkpoint may be an inconvenience, but it emphatically is not a seizure. Even if it were a seizure, however, twenty minutes would not have been unreasonable. *See United States v. Flores-Montano*, 124 S. Ct. 1582, 1587 (2004) ("We think it clear that delays of one to two hours at international borders are to be expected.").

[3]There is no question under this Court's precedent that the territorial border between the U.S. Virgin Islands and the United States is treated the same as an international border for the purposes of Fourth Amendment scrutiny. *See Hyde*, 37 F.3d at 122. ("we perceive the interest of the United States in warrantless searches without probable cause at this 'internal' border to be little different from its interest in such searches at its international borders"). And while *Hyde* addressed only the government's interest in establishing customs checkpoints, we recently explained that the nature of the checkpoint, i.e., whether customs or immigration, does not alter our analysis. *Pollard*, 326 F.3d at 414 ("the Government clearly has as great an interest in interdicting aliens as it does in regulating customs").

the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *Flores-Montano*, 124 S. Ct. at 1586. Accordingly, "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616 (1976). *See Flores-Montano*, 124 S. Ct. at 1585 (quoting *Ramsey* with approval).

In *Hyde* we upheld the constitutionality of suspicionless, customs checkpoints at the airports in the Virgin Islands, *Hyde*, 37 F.3d at 123, and in *Pollard* we upheld the constitutionality of suspicionless, immigration checkpoints at those same airports. *Pollard*, 326 F.3d at 413. We need not repeat our analyses here. Nor need we devote much attention to Mora-Santana's argument that combining two legal checkpoints – immigration and customs – into one checkpoint somehow renders that checkpoint illegal.

Mora-Santana relies on *Edmond* in support of his argument, but we find *Edmond* inapposite. In *Edmond*, the Supreme Court invalidated searches conducted by the City of Indianapolis at suspicionless, drug-interdiction checkpoints within the United States. The Court declined "to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes." *Edmond*, 531 U.S. at 44. Border checkpoints, however, are not implicated by this holding, and the Court recognized as much: "It goes without saying that our holding

5

today does nothing to alter the constitutional status of . . . border checkpoints[.]" *Edmond*, 531 U.S. at 47. *See also United States v. Montoya De Hernandez*, 473 U.S. 531, 538 (1985) ("Consistent[ ] . . . with Congress' power to protect the Nation by stopping and examining persons entering this country, the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior.").

If anything, the combination of customs and immigration functions into a single checkpoint lessens the intrusion upon individuals by subjecting them to one, rather than two, "seizures" and potential searches. And the combination of customs and immigration functions can in no way be said to indicate any diminishing of the government's interest in border control. *Cf. Pollard*, 326 F.3d at 414 ("Although there are differences between customs interests and immigration interests, we see no reason why the balancing test would yield different results when applied to [either]."). Accordingly, the dual-function immigration and customs checkpoint at the St. Thomas airport is unquestionably proper.

## B.  Roving Checkpoint

Mora-Santana also argues that because he made it through the initial immigration screening at the D.H.S. checkpoint, the government forfeited its right to conduct a second, suspicionless seizure– as Inspector Ortiz did–at the T.S.A. security checkpoint. This, he concludes, was an impermissible roving detention. The government, on the other hand, classifies what happened as having occurred at a fixed checkpoint and, thus, reasonable suspicion was not required and the conviction must stand.

6

"As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Brignoni-Ponce*, 422 U.S. at 878. In *Brignoni-Ponce*, the Court evaluated the legitimacy of suspicionless seizures of motorists within 100 miles of the United States border. Ultimately, the Court was "unwilling to let the Border Patrol dispense entirely with the requirement that officers must have a reasonable suspicion to justify roving-patrol stops." *Id*. at 882. The Court rejected the government's efforts to vest unlimited discretion in the Border Patrol to rove without warning or guidelines within a 200,000 square mile area; the Fourth Amendment interests of individuals would be unduly compromised if "Border Patrol officers could stop motorists at random for questioning, day or night, anywhere within 100 air miles of the 2,000-mile border, on a city street, a busy highway, or a desert road, without any reason to suspect that they have violated any law." *Id*. at 883.

This case presents a very different scenario than that considered by the Court in *Brignoni-Ponce*, the case on which Mora-Santana primarily relies. In *Brignoni-Ponce*, the Court contemplated the specter of erratic and arbitrary government patrols invading the innocent and private routines of daily life in any of the numerous towns and cities near the United States border. Here, we consider the much more focused and open efforts of the government to monitor and protect a discrete, international, transportation hub and

port of entry, the St. Thomas airport. The government's valid interests–in immigration and in customs–are extremely high and the privacy expectations of travelers at the airport are extremely low. Indeed, it is eminently reasonable for all air travelers to expect to be subject to routine questioning for immigration, customs, and security purposes. As the Supreme Court has on many occasions explained, "not only is the expectation of privacy less at the border than in the interior, the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." *Montoya De Hernandez*, 473 U.S. at 539-540 (citations omitted). This is particularly so, we believe, at international airports.

It is, of course, true that Inspector Ortiz's questioning of Mora-Santana at the T.S.A. security checkpoint did not occur at the precise location at which D.H.S. routinely interrogates travelers. What is also true, however, is that the brief interrogation of Mora-Santana in the airport, in the general area in which immigration, customs, and security screening occurs, was entirely reasonable and did not transgress the Fourth Amendment. We reject Mora-Santana's suggestion that once a traveler goes through an initial screening, the government is precluded from immediately acting to rectify any mistake or clear up any uncertainty.

### III. Conclusion

The Fourth Amendment protects individuals from unreasonable searches and seizures. For the reasons explained above, the seizure of Mora-Santana was reasonable.

The judgment of the District Court will be affirmed.